GEORGE WHEATON DEANS, AS ADMINISTRATOR DE BONIS NON OF THE ESTATE OF JACOB FOREMAN, DECEASED, ET AL.. APPELANTS, vs. JAMES WILCOXON ET AL.

1. The jurisdiction of the County Court, under the Constitution of 1868, as amended in 1875. in the matter of the estates of deceased persons was not exclusive of or a limitation upon the original equity jurisdiction of the Circuit Court in such matters In the absence of special equities whi h the County Court could not administer the jurisdiction of the two courts was concurrent,

JUNE TERM, 1889. 981

Deans, Adm'r, et al. vs. Wilcoxon et al.—Syllabus.

but where such equities exist the jurisdiction of the Circuit Court was exclusive of that of the County Court. The same is true of these courts under the present Constitution.

2. Where a bill filed by the heirs of an intestate assailing an order of sale of real estate made by the Probate Judge as void for want of jurisdiction, alleges that one of the lots conveyed by an administrator as having been sold pursuant to such order, was in fact not sold or offered for sale, and this allegation is admitted by demurrer, it is improper to consider the validity of the order of sale in connection with such lot.

3. Where a lot, formerly held through mesne conveyances under a title from an administrator, has been surrendered to an administrator *de bonis non* who holds it as a-sets of the intestate, the effect of possession under claim of title by the party who surrendered it, cannot be considered upon pleadings showing merely these facts.

4. The act of March 11th. 1879, "to quiet titles to real estate," Sections 21 and 22, p. 219 of McClellan's Digest, does not apply to land of which there was in fact no sale made under an order of the Probate Court.

5. An allegation of the solvency of an estate is not essential to the jurisdiction of the County Court to make an order for the sale of real estate of an entestate under the act of February 16th, 1870, McClellan's Digest, p. 86, Section 40.

6. Where the petition for a sale of real estate under the act of February 16th, 1870, McClellan's Digest, p. 86, Section 40, states that there is "no per-onal property of the intestate not administered upon." and the order of the County Court for a sale adjudicates that the personal estate has been exhaused, the jurisdiction of the court to act is shown by the record in so far as the exhaustion or insufficiency of the personal property is concerned.

7. The sufficiency of the evidence of the validity of a claim for the payment of which a Probate or County Court has made an order for sale of real estate of a decedent is not a jurisdictional fact and it is to be conclusively presumed that the court considered and was satisfied of the validity of the claim when it made the order.

8. A bill filed by heirs to arrest the execution of an order of a county court for the sale of lands of an intestate to pay debts upon the ground that the claim for whose payment the sale has been ordered is not a valid indebtedness of the estate,

982 SUPREME COURT.

Deans, Adm'r, et al. vs. Wilcoxon et al.—Syllabus.

must state facts in relation to the claim which, if true, will over throw the *prima facie* presumption of its validity created by the order. If the claim never had any existence, but is the creature of fraud or otherwise never of any validity, the fraud or invalidity, whatever it may be, should be explicitly charged, or if originally valid and a satisfaction of it by payment or otherwise is relied on, such new matter should be specifically averred. Allegations that the claim was not a debt of the estate, or not such a debt or demand as could be made the lawful predicate of an order, or not a subsisting claim or demand against the estate, or that there was no valid subsisting debt or demand against the estate for which assets in the hands of the administrator could or ought in law or equity to be liable, or that the administrator was not liable or compellable in law or equity to pay the alleged claim are but conclusions of law, the contrary of which the order of sale affirms, and are demurrable.

9. The saving clause in the act of limitations of November 10th, 1828, in favor of persons "beyond the seas or out of the country," was modified by the provisions of the act of 1846, section 2, p. 443, Thompson's Digest, to the effect that it should not extend to persons who were not at the making of the contract or accruing of the cause of action, domiciled or resident within the limits of this State; which modifying act remained in force until the suspension of the several statutes of limitation on January 10th, 1861.

10. An administratrix filed a petition in June, 1856, before the Probate Judge for the sale of land to pay a claim against her intestate, who died in March, 1856, described as an account of December 20th, 1838, for $28,620, filed and proved as due the estate of Elijah Bass, deceased, and an order of sale was made in the following September. A statute then in force provided that in suits brought against an executor or administrator for the recovery of a debt due upon open account the court should cause to be expunged from such account every item appearing to have been due five years before the death of the testator or intestate, the act having a saving clause in favor of certain plaintiffs. On a bill filed in 1882 by heirs assailing the validity of the claim, the above statute is invoked in support of a presumption of law that the claim had been satisfied prior to the proceedings of 1856: *Held*, That if the statute applied to Probate Court proceedings it must be presumed, in the absence of any affirmative showing to the contrary, that the Judge of Probate made due inquiry in

1856, and found that the claim was of a character that the statutory bar did not apply to, or had been taken out of the bar by a subsequent promise of the decedent within five years before his death, or that the parties owning it were within some saving clause of the statute.

11. Section 13 of the act of November 10th, 1828, McClellan's Digest, p. 97, section 72, to the effect that no action of debt shall be brought against an executor or administrator upon a judgment obtained against a testator or intestate, nor any *scire facias* issued to revive such judgment after five years from the qualification of the executor or administrator, and all such judgments, after the expiration of five years upon which no proceedings shall have been had, shall be deemed to have been paid and discharged, does not, if in force, nor did it when in force, apply to other claims than judgment against a testator or intestate. The presentation of a claim, not in judgment, to an administrator or executor in due time stopped the running of the statute of limitations, and such is still its effect.

12. F. died in March, 1856, and in June his administratrix filed a petition in the Probate Court for the sale of lands of his estate to pay an account of December 20th, 1838, for $28,620, filed and proved as due the estate of E. B., and in September the Judge of Probate made an order of sale, and in October a sale of one lot was made to A. E. B. and J. B., the owners of the E. B. estate claim, and J. B. died the latter part of May, 1857, leaving half of his estate to the administratrix, his mother, and the other to his wife, and the administratrix died in 1860, without having completed the sale or made a settlement of her administration, and leaving A. E. B. her sole heir and personal representative and thereupon S. was appointed administrator *de bonis non*, and in 1870 he, as such administrator, made a deed in execution of the sale made by his predecessor, bearing date January 5th, conveying the lot sold to A. E. B. and J. B., and also including another lot as having been sold but which the bill alleges was neither sold nor offered for sale, and A. E. B. and the wife of J. B. executed a deed with warranty of title conveying the lots to S., it bearing date March 21st, 1870. On February 7th, 1870, S. conveyed to a trust company with warranty of title the lot No. 8 alleged not to have been sold by the administratrix. S. died in 1871 without having settled F.'s estate. In 1881 the trust company who had been sued in ejectment by the heirs of F. for lot No. 8, and had obtained an assignment of the claim mentioned above,

procured D. to obtain letters of administration *de bonis non* on the estate of F., and surrendered lot 8 to him as assets of the estate, and D. applied to the County Court granting such letters for an order of sale of the lot to pay the above claim, less $6,555, which had been received by A. E. B. and J. B. from the estate of F. thereon, and on May 6th an order of sale was made, and in June the property was offered for sale and knocked off to "A. E. B. and the heirs and representatives of J. B." In 1882 the heirs of F. filed a bill for the settlement of the estate, and claiming that the indebtedness for the payment of which the sale was ordered in 1881 was stale and presumed to be paid and barred from the lapse of time : *Held*, On demurrer, that upon the face of the bill the claim did not appear to be so.

13. A County Court to which application is made by an administratrix for an ord r to sell real estate to pay a claim held by the sureties on her official bond may, if it appe r from her accounts that she is indebted to the estate, refuse to make the order if such sale will injure other creditors, or where, if the estate is solvent, it will injure the heirs.

14. The fact that an administratrix is joint owner of an indebtedness of the estate with a surety on her administration bond does not of itself extinguish the claim to the extent of her interest, nor will such be the result of her being the sole owner.

15. The owner of a claim against an estate holding unadministered property of it may properly procure the appointment of an administrator *de bonis non* to take possession of the property, and surrender the property to him.

16. An allegation that a person holding a claim against an estate procured another to sue out letters of administration *de bonis non* and to make application for an order to sell real estate to pay the debt does not impute illegal conduct to either of the parties, but if the administrator when applying for the order was the attorney of the creditor for the enforcement of the claim or to procure its payment out of the land ordered to be sold or to obtain title to the lot through the sale, the duties of the relation of attorney and those of administrator were at least incompatible, and if such relation to the creditor is neither expressly nor impliedly assented to by the heirs of the intestate they will not be bound by his action in the matter of the sale, but when the bill filed by the heirs assailing the indebtedness expressly states that they are willing that the sale made un 'r the order by a com-

Deans, Adm'r, et al. vs. Wilcoxon et al.—Syllabus.

missioner appointed therein shall stand, provided the owner of the claim or the parties, in whose name the property was bid off and who have been reported to the county court as the purchasers, pay into the court in which the bill is filed the amount so bid, and offers to ratify the sale upon such payment being made, and prays that the amount be so paid to be disposed of by the court, or that failing therein, the sale be set aside, the proper conclusion to be drawn is, the bill not having shown the claim to be invalid, that the heirs have not been injured by the relation sustained by the administrator to the owner of the claim, and that they have not suffered from the sale made by the Commissioner and are satisfied with the price at which the land sold.

17. A sale of real estate to pay debts will not be declared void or set aside on the ground of the invalidity of the claim for the payment of which the sale was ordered, and yet held against the will of the purchaser, the owner of the claim, to be a valid sale for sioner and the purposes of a division of the estate among heirs.

18. It will not be assumed that a party making a bid at a sale of land of an intestate in the names of others was not authorized to do so ; and if the party making a bid in the names of others comply with it and take title in their names it is of no concern to the heirs of the intestate whether the person actually bid was authorized to use the names in which the bid was made.

19. Allegations made in a bill attacking a sale of real estate of a decedent made by a commissioner under an order of the County Court, to the effect that those making the bid or interested in it do not intend to make payment thereon other than a credit on the claim for the payment of which the sale was ordered, are not sufficient, where the sale is for cash, to authorize the interference of a court of equity. The satute regulates the sale, and among other provisions directs that the County Court shall on confirming the sale direct a deed of conveyance to be executed to the purchaser by the Commissioner and its delivery to the purchaser upon his compliance with the terms of sale. It is not to be assumed that either the County Court or commissioner will violate the duties imposed by the statute.

20. The power and duty of an administrator *de bonis non* is at the common law to administer upon whatever of the estate of the decedent remains in specie and has not been administered upon by his predecessor in the administration.

21. The right of action given by the act of February 19th, 1870, p. 89

et seq., McClellan's Digest, to administrators *de bonis non* against delinquent executors and administrators who may have been removed by the Probate of County Court for cause, does not extend to *devastavits* of deceased executors or administrators who were not so removed.

22. If an original executor has fraudulently aliened an asset for his own use in collusion with his vendee, such asset will be regarded in equity as unadministered, and will pass as such to the administrator *de bonis non*. Where fraud and collusion are relied upon to give a right of action, they must be clearly shown by the pleadings; and unless a bill plainly shows that a case is within the above rule giving an administrator *be bonis non* a right of action against his predecessor, the right will be held not to exist.

23. Under the legislation prior to the act of February 16, 1870, governing sales of real estate by administrators for the payment of debts, an administrator *de bonis non* might consumate an incomplete sale made by his predecessor.

24. The heirs of a deceased administrator *de bonis non* who conveyed land under a sale made pursuant to an order of the Probate Court by his predecessor in the administration, and received a deed back from his grantees, are essential parties defendant to a bill brought by the heirs of the intestate to set aside the sale and have the land declared assets of the intestate. It is not sufficient to make the adminstrators of the deceased administrator *de bonis non* parties.

25. If a distributee entitled to the personalty of an intestate die, the administrator, or the executor, if there be one, of such distributee, is the proper person to sue for such personalty.

26. A bill filed by an heir for the settlement of an estate should show that there is a surplus of the estate over what is necessary for the payments of the debts; and charges of *devastavits* should be definite and clear.

27. A bill filed by heirs to settle an estate and making an administrator *de bonis non*, and the administrators of a previous administrator *de bonis non*, and the owner of the only indebtedness existing against the estate, which indebtedness is assailed as invalid, is not multifarious.

Appeal from the Circuit Court for Duval county.

### STATEMENT.

The original bill, appearing in the transcript, was filed May 2d, 1882, the said Deans and the administrator *de bonis non* of the estate of Jacob Foreman, and Jonathan C. Greeley, and C. F. Warriner, sureties on his official bond as administrator, and said Greeley and B. Thebaut as sureties on the bond securing the faithful application of the proceeds of the land of said estate sold by said administrator, and "Augustus E. Bass and the heirs and personal representatives of Job Bass, deceased," being named as defendants. No service of the subpœna was made, but Deans, Greeley and Thebaut appeared and filed a demurrer.

No further action was taken until the sixth day of November, 1882, when an amendment to the bill was filed. Among other changes made by this amendment the names of Warriner, A. E. Bass, and the "heirs, &c., of Job Bass," as defendants were dropped, Greeley and Thebaut being retained as defendants as "sureties on " Deans " official bonds as such administrator;" and John J. Knox (a resident of the District of Columbia) as Commissioner of the Freedman's Savings and Trust Company, and said company, a corporation created by the laws of the United States, and residing in the said district, being named as additional defendants.

On the fourth day of December of the same year, Deans filed a precipe in the office of the Clerk of the Circuit Court of Duval county, requesting the clerk to enter his "special appearance in the above cause for John J. Knox, Commissioner of Freedman's Savings and Trust Company, and for the Freedman's Savings and Trust Company named as defendants therein;" the same being signed " Geo. Wheaton Deans, solicitor."

On the same day Deans, Greeley and Thebaut demurred to the bill as amended, and no further proceedings were had

until the *twentieth* day of September, 1883, when an "*amended bill*" was filed. With this bill alone we have to deal.

The complainants in this bill are James Wilcoxon, Redessa Minerva Wilcoxon, John W. Rusk and Emma E. Rusk, and Ella Wilcoxon, Uhricksville, Ohio; Jacob Mason Wilcoxon and James Franklin Wilcoxon, of San Louisobiespo, California; Samuel B. Albright, Felix Albright and Sampson Albright, of Killbuck, Holmes county, Ohio; Lydia Steelsmith and John Steelsmith, of Boon, Boon county, Iowa.

The defendants are Deans, as administrator *de bonis non* aforesaid, Greeley and Thebaut, "sureties on his official bond as such," Theodore Hartridge and Edward M. L'Engle, as administrators of the estate of John P. Sanderson, deceased, John J. Knox, as Commissioner aforesaid, and the said Freedman's Savings and Trust Company.

It alleges: 1st. That Jacob Foreman died intestate in Duval county, in this State, in March 1856, leaving real and personal property therein; that his last will and testament was duly admitted to probate by the Probate Court of the county, and letters testamentary thereon granted to A. M. Reid as executor. Reid qualified and entered upon his duties as executor, but shortly afterwards it was made known that Laura Ann Foreman, the only child and heir at law of the testator, and sole legatee and devisee under said will, had died at the age of four years, in 1842, many years prior to the making of the will. That thereupon one Elizabeth Foreman then, and continuously to the day of her death, a resident of Tensas parish, Louisiana, and claiming to be the widow of said Jacob, applied to said Probate Court to revoke the said letters testamentary on the ground that the will had lapsed and become of no effect, because of the death of said Laura Ann, and the court revoked the same on the 16th

day of June, 1856, letters of administration on said estate were granted to said Elizabeth, one Job Bass and one A. E. Bass, sons of Elizabeth by a former marriage, and over twenty-four years of age, and residents of said Tensas parish, becoming the sureties on her administration bond in the penal sum of $20,000 ; the said Elizabeth settling in full with Reid, and taking possession of the assets, real and personal of the estate. The evidence upon which the Probate Court acted, including that as to the claim of Elizabeth to being such widow is stated to be voluminous, and liberty of reference to it is prayed, but it is not before us.

2. That on June 8th, 1856, the said administratrix, by her attorney-in fact, J. P. Sanderson, filed a petition in said Probate Court praying an order or the sale of slaves, lands . and tenements belonging to the estate, and alleging that "the personal property of said intestate is insufficient to pay the just and lawful debts and demands against said estate, a schedule of said debts and demands, and of said personal property ' being annexed to the petition as a part thereof.' "

"A."

Schedule of debts and demands against the estate of Jacob Foreman .

| | |
|---|---|
| Dower of widow, estimated................ | $12,012.78 |
| 1838, Dec. 20th.—Account filed and proved due estate of Elijah Bass, deceased............... | 28,620.00 |
| Amount due A. M. Reid................... | 950.00 |
| Estimated expenses, administration, probate fees, commissions, &c................ | 2,000.00 |
| | $43,582.78 |

Schedule personal property of estate of J. Foreman, in the hands of administratrix :

Cash in hands of deceased, at his death........ $2,391.61

Cash from sales perishable property.......... 601.17
Notes and Florida stocks and securities....... 13,732.78

                                  $16,725.56

Mem.: Cash in stocks in hands Cashier Bank America,
    in New York, not in hands of administratrix :

Georgia and Kentucky bonds.... ............ $9,000.00
Cash in hands of Cashier Bank of America, New
    York, in which widow has half for dower.... 6,320.00

                                  $15,320.00

                   "B."

Schedule land and tenements and slaves of the estate of
    Jacob Foreman, deceased:

Four Slaves, valued at...................... $ 3,800.00
Two Lots and Improvements in Jacksonville.... 3,500.00

                                  $7,300.00

That the said Elijah Bass mentioned in said schedule A, was the father of said Job and A. E. Bass.

That the claim of dower was wholly unfounded and (as complainants are informed and believe) in no event a future entering into the determination of the question whether or not the court should grant the order of sale of lands to pay the debts of the estate.

That the court had no jurisdiction to order a sale, as the petition did not allege the *exhaustion* of the personal assets, but on the contrary, it showed that the personal property had not been exhausted.

That the claims or demands for the payment of which the sale was prayed were not debts or demands against said estate, and were not such claims or demands as upon a petition setting up the jurisdictional facts could be made a lawful predicate upon which to order a sale of said real es-

tate, nor were they or either of them subsisting claims or demands against the estate of Foreman.

3d. That on October 20th, 1856, the Probate Court made an order granting the application, but Lot No. 8, of Block 31, in said city of Jacksonville, of which Foreman died seized and possessed, was not sold or offered for sale under said order, but the title to it remained in the heirs of Foreman. A copy of this order is annexed to the bill. The jurisdictional statements of it are : that it appears to the satisfaction of the court that the personal property of the estate is insufficient to pay the debts, and that the notice required by the statute has been given by the administratix. The order appears, however, to have been made on *September* 27th, 1856.

4th. That Foreman's estate was large and valuable, possessing bonds, stocks, cash and cash securities largely in excess of the lawful demands and just claims owing from it. That the administratrix, through her attorney-in-fact, Sanderson, paid off and discharged without suit, abatement or delay, all the lawful claims and demands of the estate.

5th. That Job Bass died prior to May 27th, 1857, in Tensas Parish, Louisiana, he being still a resident thereof, and left a large and valuable estate, and a last will and testament which was duly admitted to probate on said day in the 10th District Court of Louisiana, it having jurisdiction thereof, by which he bequeathed one-half of his worldly goods and effect, rights and credits to his wife, Julia Bass, and the other half to his mother, the said Elizabeth Foreman. That thus said Elizabeth during the administration of said Foreman's estate became entitled to the one-half of said Job's worldly goods and effects, rights and credits.

That before, or during the early part of the year 1860, the said Elizabeth died, she being still a resident of said Tensas Parish, and at her death had not made a settlement

of her administration of Foreman's estate, or any distribution, partial or final to those entitled thereto, and (charged upon information and belief) largely indebted to said estate and leaving large estates in Louisiana, and the said Augustus E. Bass as her sole heir at law and personal representative; and thereupon said Bass possessed himself of said estate.

That said Bass, as such personal representative, or otherwise, has in no way made any settlement of said Elizabeth's administration of Foreman's estate, or accounted to or with those entitled thereto, for such administration; and the "said Bass is now, and he has been since the death of said Elizabeth, beyond the jurisdiction of this court to compel such a settlement."

6th. That on Aug. 6th, 1860, the said Sanderson, who was the attorney-in-fact of said administratrix, and her attorney-at-law in respect to her administration, and who performed all the functions that were performed in said administration, applied for and obtained, upon the death of the said Elizabeth, letters of administration *de bonis non* upon Foreman's estate, he giving bond as such in the sum of $10,000. That as a basis of his application, Sanderson set up that there were funds in the State of New York, and unadministered property in Florida, belonging to said estate, and thereupon he possessed himself of said funds in New York, and said property in Florida. Complainants are not advised as to the exact amount of the said funds which Sanderson so received, but upon information and belief, aver the fact to be that the amount was several thousand dollars.

7th. That on January 5th, 1870, Sanderson, desiring to possess himself of the title to Lots 7 and 8, of Block 31, in the City of Jacksonville, executed a deed, a copy of which is annexed to the bill, purporting to convey, as administrator *de bonis non*, aforesaid, to Augustus E. Bass and Job Bass,

said lots 7 and 8, in execution of a sale of the same to said Augustus E. and Job, alleged to have been made by his predecessor, the said Elizabeth, administratrix aforesaid, and thereupon the said A. E. Bass and wife, and Julia Brown formerly the wife of Job Bass, and Atlas F. Brown, her husband, reconveyed the lots to Sanderson with warranty of title. The deed from Sanderson bears date January 5th, 1870, and that to him, bears date March 21, 1870, but they are charged to have been only one transaction, and to have been filed for record in the clerk's office on the same day.

That the recitals in the deed from Sanderson, as to lot 8, are wholly untrue. That it had never been sold, or advertised, or offered for sale by said Elizabeth, or reported to her by her said attorney-in-fact as having been sold, advertised or offered for sale ; nor was any money paid to or received by her as purchase money of this lot.

That lot 7 was reported by her as having been sold under said void order of sale.

That no claim to either of said lots was asserted by said " Basses, " or either of them, or by the representatives of Job Bass after his decease, but the title to and possession of said lots remained in the estate of Foreman until the possession of said estate was divested thereof, or sought to be divested thereof, by the deeds from and to Sanderson.

8th. That on February 7th, 1870, Sanderson executed an individual deed, by which he undertook to convey said lot 8, with warranty of title to the defendant, The Freedman's Savings and Trust Company ; and in June, 1871, he departed this life in Duval county, Florida, intestate; having made no settlement whatever of his administration of the estate of Foreman, nor any distribution thereof, partial or final, to those interested therein, and having filed no inventory of said estate, and having made no return whatever in and court in respect thereof; yet leaving a large es-

tate, real and personal, in said county, and in the possession of and claiming the fee to said lot 7, under and by virtue of said deed to him.

That defendants, L'Engle and Hartridge, qualified as administrators of Sanderson's estate, and administration thereon is still pending. That said administrators have made no settlement of Sanderson's administration, *de bonis non*, of Foreman's estate, nor any payment or distribution, partial or final, to those interested therein, on account thereof, but his administration is wholly unsettled.

9th. That Deans was appointed administrator *de bonis non* of Foreman's estate by the County Court of Duval county, Florida, on February 21st, 1881, and on the 23d day of April following filed therein an application for an order to sell lot 8 to pay the debts of the estate. A copy of the petition is annexed as a part of the bill. It alleges that there is "no personal property of the intestate not administered upon," and that the lawful debts and demands now existing against said estate amount to the sum of $22,665. The debts are stated in an annexed schedule as follows, viz:

Amount due Augustus E. Bass and Job Bass, sole heirs of Elijah Bass, deceased, as per probated account approved and filed in the Probate Records of this county of Duval, State of Florida, on June 16th, A. D. 1856, and to which reference is hereby made for date and evidence of said account and amount due............ $28,620.00

Less amount received by Augustus E. Bass and Job Bass from said estate... ............ 6,555.00

          Balance due.................... $22.065.00

Estimated expenses of sale, Probate fees and commissions............................ 600.00

                               $22,665.00

JUNE TERM, 1889. 995

Deans, Adm'r, et al. vs. Wilcoxon et al.—Statement of Case.

That an order of sale was made May 6th, 1881. This order, made by the County Court of Duval county, recites the filing of the petition "for the purpose of paying the debts against the estate of said Jacob Foreman, and it appearing by said petition and the schedule annexed thereto that there are debts against said estate, and no means of paying the same or any part thereof without recourse to said estate, the personal property of said estate having been exhausted." It orders a sale of all the estate, right, title and interest of said (estate of) Jacob Foreman, deceased, of, in and to said lot 8, to pay the debts of the estate, and appoints John S. Driggs the Commissioner to sell, and directs that he make written report of the sale, and that he make no conveyance of the whole or any party of the real estate until the sale shall have been confirmed by the County Court.

10th. That before Deans filed the above petition an action of ejectment was instituted in the Circuit Court of Duval county against the tenants in possession of lot 8, to recover the same, by James Wilcoxon, who is the surviving husband of Sarah Wilcoxon, who was the sister of Jacob Foreman, and was at and before the death of Jacob, the wife of said James, she having died June 23d, 1879, and by complainants, Jacob Mason Wilcoxon, Redessa Minerva Wilcoxon, Emma E. Rusk and her husband, John W. Rusk, in her right, James F. Wilcoxon and Ella A. Wilcoxon, children of said Sarah Wilcoxon, and Lydia Steelsmith, a sister of Jacob Foreman, and John Steelsmith, her husband, in her right, and Samuel B. Albright, surving husband of Elizabeth Foreman who died in 1879, and was a sister of said Jacob, and Felix Albright and Simson Albright, children of said Samuel and Elizabeth, these parties being the heirs at law and distributees of said Jacob, who died leaving no children or

descendants thereof. That upon the trial the said plaintiffs took, as they were compelled to do, a non suit, the said Deans having introduced in evidence his letters of administration to show a right of possession in himself.

11th. That the Freedman's Savings and Trust Company, recognizing the invalidity of its above stated title to lot 8, and desiring to acquire the title to said lot residing in the heirs of Jacob Foreman, procured from the grantors who executed the above described deed to Sanderson, and assignment of said claim alleged to be due to the estate of Elijah Bass by the estate of Foreman, and procured Deans to sue out letters of administration *de bonis non* on Foreman's estate, and to make application for the sale of said lot 8 to pay said debts. That at the time of making application for letters of adminstration, Deans had no connection with Foreman's estate or any alleged claim due from it, or any interest in or connection with said lot, except as the attorney of the Freedman's Savings and Trust Company, or its said commissioner, which relation of attorney he occupied at the time the letters of administration were granted, and now occupies.

12th. That on May 6th, 1881, the County Court made the order of sale, and on June 6th, Driggs exposed the lot to sale in pursuance of the order, and one Lockwood, the agent of said company, bid it off at the price of $13,000, and the sale was reported to the court as having been made to Augustus E. Bass and the heirs and representatives of Job Bass deceased. The court has not confirmed the sale, nor taken any action thereon. At or before this sale the Freedman's Savings and Trust Company, or its said Commissioner, surrendered the possession of the lot to Deans, as such administrator, and he still retains possession of the same as assets of Foreman's estate, and as such administrator is receiving the rents and profits of such possession.

13th. That no purchase money was paid on said bid, nor was it intended by those making it or interested therein, or any of them, that any payment in cash should be made, or that any payment of the bid should be made, other than crediting the amount bid, as cash, upon the alleged debt aforesaid, for the payment of which the lot was ordered to be sold, and which claim has been assigned to the said company, or its said commissioner; and as the company held the deed of Sanderson conveying said lot with warranty and Sanderson held the deed of A. E. Bass and the representatives of Job Bass, conveying the title to said lot to him with warranty, it was immaterial whether said bid so reported, and the sale thereon was confirmed by the said court to the said company, who, "as your orators aver," really made the bid through its agent Lockwood, or to the said E. A. Bass, and the heirs and representatives of Job Bass, as by the operation of said warranties, the deed of the commissioner executing the sale would enure in either event and exclusively to said company.

That the whole purpose underlying the application by Deans for said administration and the proceedings had by him to effect a sale of the lot, will be accomplished and complainants defrauded, by having the amount of said bid credited on or applied to said alleged claim and the deed executed either to said company or the parties in whose name the bid is reported as having been made.

14th. That at the time of the appointment of Sanderson as administrator *de bonis non* aforesaid, there was no valid subsisting debt or claim of any kind against the estate of Foreman, for which the estate or the assets thereof in the hands of Deans, as administrator aforesaid, could or ought in law or equity to be liable, nor was Deans liable or compellable to pay the above specified claim—or any other claim in his capacity as administrator *de bonis non*.

15th. That the County Court to which Deans applied for the order of sale, had no jurisdiction in the proceedings based on said application to determine whether or not the said alleged claim " was established as a predicate for said order—(if said debt or claim ever existed, which is denied,) or if such debt or claim was a valid subsisting debt when administration was originally granted on said estate, which is denied ; the reasons alleged are: Section 1st, that inasmuch as the said Job Bass and A. E. Bass were sureties on the administration bond of said Elizabeth, and were, as is alleged, the beneficial owners of said alleged claim, it could not be determined by said court until there was a settlement by said Elizabeth, or her personal representative, the said A. E. Bass, of her administration of said estate whether or not the said Elizabeth and her said sureties were indebted to the said estate; 2d, that inasmuch as the said Elizabeth succeeded under the will of Job Bass, which was probated May 27th, 1857, to the said claim, if it was at the time a valid and subsisting debt, as co-owner thereof the right to receive and the duty to pay was united in the same person and thus was extinguished by operation of law ; and the status of said Elizabeth as a creditor or as a debtor of said estate was thus made dependent upon and could be determined *only* by a final settlement of her administration.

16th. That if there were valid and subsisting debts at the time of Deans' application for an order to sell, it could not be determined by said County Court that there was a necessity for the sale of lands for the payment of debt; or that the personal estate had been exhausted, or was insufficient to pay debts, or that the debt exceeded the value of the personal estate, until there had been a final settlement of said administration of Elizabeth, and that of Sanderson, in person, or by their representatives. When the order

was granted there was abundant evidence in the files of said court that each of said administrations was outstand. ing and unsettled.

17th. But complainants are willing that the sale made by Driggs should stand, provided said Freedman's Savings and Trust Company, or the parties in whose name the bid is reported as having been made, pay into this court (Duval county Circuit Court) to be distributed by it to those entitled thereto the purchase money so bid, and hereby offer to ratify said sale upon the payment by said purchasers into this court the said purchase money, to be disposed of by the order of this court.

The other facts of the case are stated in the opinion of the court.

*Geo. Wheaton Deans, C. P. & J. C. Cooper, Fleming & Daniel* for Apellants.

*A. W. Cockrell & Son* for Appellees.

This cause is now on appeal by Deans *et al.*, defendants below, from the decree of the Chancellor overruling demurrer to the bill.

The bill is not multifarious.

This bill embraces but a single matter, the settlement of the estate of Jacob Foreman, and its distribution to those entitled to it.

The final settlement and distribution of the estate of Jacob Foreman of necessity involves the judicial determination of every issue raised in the pleadings, and of the rights of all parties introduced upon this record, whether complainants or defendants. And the defendants are related to, and their rights are so intertwined with the primary object and purpose of the bill that the equities of all cannot

be administered in separate and independent suits. But were it otherwise the rule is, " where the object of the suit is single, different persons having or claiming separate interests in distinct or independent questions, all connected with or arising out of the single object of the suit, may be joined as defendants, so that the whole object of the bill may be obtained in one suit." Hayden vs. Thrasher *et al.*, 18 Florida, page 808 ; Boyd vs. Hoyt, 5 Paige, 65.

And the Supreme Court of the U. S. says, in 3 How., 333 : " If entire justice cannot be so conveniently done against the same defendants, without uniting different subjects, they may be entitled in a bill;" and in Payne vs. Hook, 7 Wall., 433 : " This case involves but a single matter, and that is the true condition of the estate of Fielding Curtis, which, when ascertained, will determine the rights of the next of kin. In this investigation all the defendants are jointly interested."

But suppose the defendants are not interested in all the issues raised upon this record, the rule laid down in Carroll vs. Rosevelt, 4 Edwards, 211, is fatal to the demurrer. " When complainants have a common interest in all the matters of the bill, and the defendants are concerned only in portions, and a demurrer is interposed of multifariousness, the court will look to convenience and expediency." The rule declared in Mayor of York vs. Pilkington, 1 Atkyns, 283, and approved in Whaley vs. Dawson, 2 Schoales & Lefroy, 367, is that " where there was a general right claimed by the bill against the defendants, and covering the whole case, the demurrer would not be allowed."

In Whitman vs. Abenathy, 33 Ala., 160, a married woman sought to displace her trustee, and have one substituted, and to recover the property from the purchaser to whom the trustee had sold it, the purchaser insisted, as do the defendants here, you cannot introduce me as a de-

fendant on this record, with a large part of which I have no concern, and thus subject me to an expensive litigation between you and your trustee, when you might in an independent suit determine whether you or I have the better title to this property. But the court held there was a propriety in making the purchaser a co-defendant, and overruled the objection of multifariousness.

3. The administrators of Sanderson's estate are responsible to the next of kin for the assets of Foreman's estate administered by Sanderson, or for his delinquency in not recovering them, and not to the administrator *de bonis non.* *Vide* Deale vs. New Mexico, 16 Wall., 541.

The amended bill is found in the record, beginning on page 50. The first exhibit—the petition of Elizabeth Foreman—for the sale of lands, slaves, &c., is referred to as Exhibit No. 1 and is found in this record at pages 35, 36 and 37, endorsed as Exhibit No. 1. The other exhibits are marked and endorsed consecutively as Exhibits No. 1, No. 2, No. 3, &c., and *annexed* to the amended bill.

### SUPPLEMENTAL BRIEF FOR APPELLEES.

The original argument for respondents in this court, and in the court below, was addressed chiefly to the grounds of demurrer specified in the court below, to the amended bill of appellees, complainants below.

We are advised, further argument is desired upon the several propositions, and in the order herein discussed.

*1st. Is the jurisdiction of a court of equity, in the settlement of a decedent's estate, concurrent with the County Court, or supervisory and directory thereof?*

The solution of this question involves the interpretation of the constitutional provisions, by which courts of equity and County Courts, are recognized or created, and their several jurisdictions defined.

Sec. 8 of Article VI, Constitution 1868, as amended reads: " The Circuit Courts shall have original jurisdiction in all cases in equity," etc.

Sec. 11, of Article VI reads: " The County Court shall have power to take probate of wills, to grant letters testamentary and of administration and guardianship to attend the settlement of the estates of decedents and minors, and to discharge the duties usually pertaining to courts of Probate, subject to the direction and supervision of the appellate and equity jurisdiction of the Circuit Court, as may be provided by law."

It will be observed that the Circuit Court has no original jurisdiction whatever of the settlement of a decedent's estate, whether begun in the County Court or not, unless the settlement of a decedent's estate makes " a case in equity." It also follows, if the settlement of the estate of the decedent makes what was known, at the adoption of the constitution as " a case of equity."

Then the grant of jurisdiction to the Circuit Court is not taken away by the grant of similar jurisdiction to the " County Court," unless the grant to the County Court is exclusive.

It will be observed, too, that while the jurisdiction of the Circuit Court conferred by the Constitution in cases " at law " is limited, the jurisdiction conferred upon that court in "cases in equity" is unlimited, extending to " all cases in equity."

We assume it will not be denied that the settlement of the estates of decedents is now, and has ever been, regarded as a " case in equity," a distinctive and fruitful and " peculiar branch of equity jurisdiction." Amos vs. Campbell, 9 Fla., 187, 193.

We submit then if the constitutional grant of jurisdiction of County Courts over the settlement of decedents' es-

tates, in the clause we have quoted, had been unqualified, it would not have ousted the general jurisdiction, in that behalf *thereinbefore* conferred upon Circuit Courts.

Mr. Pomeroy, in his excellent work on equity jurisprudence says, sec. 1153, Vol. III, page 93: "One fundamental principle should be constantly kept in mind; it underlies all particular rules, and furnishes the solution for most of the special questions which can arise. In all those States which have adopted the entire system of equity jurisprudence, whatever be the legislation concerning the powers and functions of the Probate Courts, and whatever be the nature and extent of the subjects committed to their cognizance, the original equitable jurisdiction over administration does and must still exist, except so far and with respect to such particulars as it has been abrogated by express prohibitory, *negative* language of the statutes, or by necessary implication from affirmative language conferring exclusive powers upon the probate tribunals. This equitable jurisdiction may be dormant, but, except so far as thus destroyed by statute, it must continue to exist, concurrent with that held by the courts of probate ready to be exercised whenever occasion may require or render it expedient.

This general principle, so familiar, running through all branches of the equitable jurisdiction, but so often lost sight of by American courts in dealing with the jurisdiction as applied to administrations, was admirably stated by one of the ablest American Judges. "There is nothing in the nature of jurisdiction, as applied to courts, which renders it exclusive. It is a matter of common experience that two or more courts may have concurrent powers over the same parties and the same subject-matter. Jurisdiction is not a right or privilege belonging to the Judge, but an authority or power to do justice in a given case, when

it is brought before him. There is, I think, no instance in the whole history of the law where the mere grant of jurisdiction to a particular court, without any words of exclusion, has been held to oust any other court of the powers which it before possessed.

"Creating a new forum with concurrent jurisdiction may have the effect of withdrawing from the courts which before existed, a portion of the causes which would otherwise have been brought before them ; but it cannot affect the power of the old courts to administer justice when it is demanded at their hands."

Thornton, J., says in Rosenburg vs. Frank, 58 Cal., 387, (see note 1 to said sec. 1153, page 95,) " nor could this be done if the full Probate jurisdiction conferred on the County or Probate Courts by the Constitution," quoting in support Courtwright vs. Bear River, etc. Co., 30 Cal., 573. " But it is said that the Probate Court first acquired jurisdiction, and therefore must be allowed to exercise it to the exclusion of the district court. We do not think that this rule can be properly applied here. The will had only been admitted to Probate in the Probate Court. The matter of distribution was not before it. Moreover the Probate Court held its jurisdiction subject to the exercise of this jurisdiction by the district court. Of the Probate the jurisdiction of the Probate Court is exclusive. San Francisco vs. Lawton, 18 Cal., 465. Until that was done the district court could not exercise the jurisdiction invoked in this case. To hold that the Probate Court had first acquired jurisdiction to the exclusion of any other court by the will having been admitted to probate in it would be to oust the jurisdiction of the district court entirely. The Probate Court taking jurisdiction under these circumstances, it holds it subject to the jurisdiction of the district

court, and must be bound by the decree of the district court. We are of opinion that this jurisdiction in the district court is a beneficial one, and can be usefully employed in expediting the settlement of estates."

But it will be observed that the Constitution of Florida does not confer, without qualification, upon the County Court, jurisdiction of the settlement of estates of decedents. The grant thereof is declared to be subject to the " appellate *and* equity jurisdiction of the Circuit Court." If the jurisdiction of the County Court were subject only to the appellate jurisdiction of the Circuit Court it may be the original jurisdiction of the later tribunal would not have been taken away. But so careful, however, were our Constitution makers to guard the integrity of the original jurisdiction of administrations in the chancery court against *any implication* arising from the grant of jurisdiction to the County Court, they declared this last grant subject not only to the direction and supervision of the Circuit Court, in its character as an appellate court, but also, to the direction and supervision of the Circuit Court, in its character as an " *equity jurisdiction.*" When we consider that this " equity jurisdiction " of the circuit had been therefore declared to extend to " all cases in equity " and to be " original," there can be no doubt our Constitution makers intended that the equity jurisdiction of the Circuit Court, should not only be original and unlimited, but also concurrent with, and directory and supervisory of, the County Court.

In Sanderson's administrator vs. Sanderson, 17 Fla., 820, it is adjudged " a court of equity has concurrent jurisdiction with the Probate Court over the administration of the assets of deceased persons. That annual accounts have

been filed in the Probate Court does not divest a court of equity of this jurisdiction.

*2d. When a County Court has taken jurisdiction of a decedent's estate, and is proceeding to a settlement of the same, can a court of equity oust its jurisdiction, except for special causes, which would show that the County Court was incompetent for some special reason to make a complete settlement of the estate.*

*3d. Does the bill show any such reason?*

In the case at bar, no settlement whatever had been made, in the Probate or Circuit Court, partial or final, of Foreman's estate, by either of the several administrators appointed thereon ; nor had any accounts been filed, or other steps been taken, looking to a settlement thereof; nor had any distribution thereof been made ; nor any steps taken looking to a distribution.

The rule is, that while the beneficiaries of an estate, heirs and distributees, " are entitled to carry their cause into equity, at any time before the concurrent jurisdiction of the Probate Court over the settlement has attached, without assigning any special reason for doing so, this privilege is not conceded to an executor or administrator, when he undertakes to transfer the administration into chancery, *he* must assign a good equitable ground for so doing."

In, Teague vs. Corbet, Administrator, 57 Ala., 537, Brickell, C. J. approving this principle, says: " No proceedings had been commenced in the Court of Probate for a final settlement of the administration, and none for distribution, prior to the filing of the present bill ; and the case presented by it falls within the original jurisdiction of a court of equity."

In the absence then, as shown 'by the bill, of any steps taken in the Probate Court, looking to a settlement, or distribution of Foreman's estate, the subject matter of the

final settlement and distribution of Foreman's estate, was not before that tribunal ; and to hold that a grant of letters, and a few administration orders taken by the County Court in the course of administration create such an acquisition of jurisdiction by that tribunal of the final settlement and distribution of Foreman's estate as ousts the original jurisdiction of the Circuit Court, would be to abrogate the jurisdiction of the Circuit Court, over the administration of decedent's estates under our system. Yola county vs. Sacramento, 36 Cal., 195.

But conceding the County Court has acquired jurisdiction, the special facts and circumstances set up in the bill, the complicated and numerous matters of account to be settled, and trusts created, show the machinery of the County Court is wholly inadequate to the final settlement and distribution of Foreman's estate. What are they?

A. Two successive administrators, between whom there is no privity, with two sets of sureties, have died without making final account and settlement of the trusts committed to them.

. B. The bill alleges that the first administrator paid off and discharged without suit, abatement or delay all the lawful claims and demands against said estate.

C. That the defendant company procured an assignment of an alleged claim against said estate, based upon the alleged appropriation of certain crops in 1837-1838, in Louisiana, a part of which has been paid by the administratrix, the mother of the claimants, in 1857, nineteen years after the claim evidenced merely by an open account accrued and eighteen years before the death of the decedent.

D. That on the 21st of February, 1881, the defendant company as the assignee of said alleged claim procured one Deans to make application for letters of administration, D. B. N., on said estate.

E. That in suing out said letters said Deans acted as the attorney of said company, which relation he then sustained and now sustains to said defendant company.

F. That said Deans interposed his letters of administration so sued out to defeat a suit in ejectment brought by complainants to recover said lot 8, and then procured an order of the Probate Court to sell lot 8 to pay said alleged debt, that said lot was offered for sale and bid in by the assignors of said claim for the sum of $13,000.00.

G. That in making said bid it was not purposed by said administrator Deans, or his client, that it should be paid in cash, or otheswise than by having the amount of said bid credited on said alleged indebtedness.

H. And that the whole purpose underlying the application, by said Deans, for the grant of administration, upon the estate of said Jacob Foreman, and the proceedings had by him to effect a sale of said lot will be accomplished and your orators defrauded by having the amount of said bid credited on, or applied to said alleged claim.

I. The bill further alleges that that there was no valid or subsisting debt of any kind against said estate, for which said estate or the assets thereof, in the hands of said Deans, as administrator as aforesaid, could or ought in law or equity be made liable. Record vs. Williams, 7 Wheat., 115, 116, 117, &c.

K. Nor was said Deans in any forum in law or equity liable or compellable to pay said claim alleged to be due the estate of Elijah Bass, deceased, or any other claim, in his capacity as administrator *de bonis non* of said estate. McC.'s Digest, p. 96, sec. 71.

L. The bill further alleges that inasmuch as the assignors of said alleged debt, Job Bass and A. E. Bass, were sureties on the administration bond of their mother, the first administratrix, it could not be determined by the Pro-

bate Court whether the estate of Foreman was indebted to said sureties, or said sureties indebted to said estate, until there was a final settlement of Mrs. Foreman's administration.

M. And that these two sureties and their representatives were beyond the jurisdiction of the Probate Court, and could not be compelled to settle.

N. The bill further shows that by the death of said Job Bass, and his will duly probated, before the death of his mother, the administratrix, she became entitled to one-half of his, Job's, estate, including this alleged debt, if it were a valid subsisting debt, and the said administratrix having thus become the owner of said debt united in her own person the right to receive and the duty to pay such debt; hence said alleged debt, if it was a valid and subsisting debt, became extinguished by the operation of law, and was simply a voucher in Mrs. Foreman's hands, only available upon a final settling and accounting by her. Ragland vs. Calhoun, 36 Ala., 606 ; Brs. Deg., Vol. 1, p. 967, sec. 742.

Now we submit each and every of these several features constitute a valid reason for withdrawing the settlement, if it had been actually begun therein from the probate into the chancery court. Sec. 1153 and note, Pom. Eq. ; see 12 Cal., 436 ; Feagan vs. Corbet, 57 Ala., 529.

And the demurrer admits each and every of the several allegations of the bill exhibiting these features.

4th. If a court of equity assumes jurisdiction of a decedent's estate which is in process of settlement in the County Court, and in the course of which, a claim against the estate has been allowed and partly paid, is this action of the court, as regards this claim *res adjudicata* to such extent as to prevent a court of equity reviewing it? See 12 Ark.,

96, as to the judicial effect of an allowance and the reason upon which it is based.

It will be observed that the so-called payment and allowance were made by Mrs. Foreman to her only children, the Basses, who were also sureties on her administration bond, to what extent, the court was informed of the facts, when the claim was " allowed " if allowed, at all, we are not informed.

Suppose, however, the Basses had sued their mother as administratrix in the Circuit Court, on this claim, and Sanderson as the attorney of the administratrix, had in some perfunctory way defended the suit by suggesting that the claim was barred, and could not be enforced, and the Circuit Court had given judgment against the administratrix had instead of appealing to the Supreme Court and assigning as error, in that tribunal, the refusal of the court, to strike out the entire claim, paid the judgment, and upon a final settlement had asked to be allowed a credit for the payment, and suppose further that she could not be reimbursed unless she were allowed to retain from the assets in her hands arising from the sales of the lands of the intestate made under the decree of the court of probate. Would she have been allowed the credit claimed, as a payment of a judgment had upon a case made in the Circuit Court, upon pleadings between parties in adversary relations? For answer we refer to the decision in Teague vs. Corbett, Administrator, 57 Ala., 541-2-3-4. In Alabama the Circuit Court is not as in Florida, required to be active and diligent in striking from the account of the creditor, all items over five years old at intestates' death.

If then an adverse judgment of the Circuit Court will not protect an executor or administrator, who has paid it, in his claim for a credit therefor on his final settlement of his administration, how far short of an " adjudication " au-

thorizing a reimbursement of the administrator, who paid the claim, or a part of it, thus " allowed " do the facts herein appearing fall?

Conceding that the so-called allowance of the claim of the Basses by the Judge of Probate, and its part payment by the administratrix, invested with all the dignity of a solemn judgment, pronounced by a court of competent jurisdiction, rendered in favor of a plaintiff against a defendant, duly impleaded upon adversary and not collusive pleadings, and this is the utmost that can be claimed for it. If the unpaid part of said claim should be made the basis of a further proceeding in the Probate or Chancery Court twenty-five years later, the court would not, in the sense of reviewing the former adjudication or allowance, but conceding to it full dignity and respect, *at the time it was so alallowed*, would declare this unpaid balance extinguished by lapse of time. See authorities cited to next proposition.

But this allowance and part payment in no sense constituted a judgment.

What is a judgment? " It is the final consideration and determination of a court of competent jurisdiction upon the matters submitted to it, and it is only evidenced by a record." Freeman on Judgments (3d Ed.), sec. 72, *a*.

Suppose we concede the Judge of Probate had jurisdiction to render a judgment in favor of the Basses, administratrix of Foreman's estate, for twenty-eight thousand six hundred dollars, where is the evidence of the suit upon which such judgment was rendered? Who brought the suit? Certainly a judgment cannot be rendered in favor of a person not a party to the suit. Were the Basses parties to this so-called judgment? Would they have been *concluded* by a rejection of the claim by the Court of Pro-

bate? Was this so-called judgment susceptible of being enforced by execution? What characteristics of a judgment of a final definite determination of the issue between the parties did it possess?

5. If twenty-five years have elapsed since such allowing and part paying of said claim, will the law, notwithstanding its character as a quasi judgment upon the petition of an administrator for the sale of real estate of the decedent for its payment presume that said claim has been paid?

6. What effect did the statute, section 12, November 10, 1828, as to duty of Judges to strike out every item of an account due more thon five years before the death of the intestate, or testator, in a suit against the administrator or executor, have upon the jurisdiction of the court to order a sale of real estate to pay a debt due eighteen years? This as to first application for an order to sell?

7. What effect did the statute, section 13, November 10, 1828, barring all proceedings on a judgment against decedents, have upon the application to sell real estate to pay a balance of a claim forty-three years from the time it was first due, and twenty-five years from this allowance and part payment by order of the Probate Court?

There are two statutes of limitations in Florida: One general declaring "an action can only be commenced upon a judgment or contract under seal within twenty years." " On a contract not under seal, five years, (see act of February 27, 1872,) and the other a special statute, disclosing the legislative policy in respect to claims against estates of deceased persons. (Sections. 12 and 13, Act of March 11, 1828.)

In Bird vs. Inslee, 8 C. E.; Green, 363; a bill was filed to revive a suit in equity founded on a judgment obtained more than twenty years before the bill was exhibited, and it was held the judgment must be presumed to have been

paid, and the bill was therefore dismissed. The court says: " In this case, from the facts stated in the bill of revivor, the presumption of payment arises, and therefore the question is properly raised by demurrer.

It is the settled doctrine of equity that the statute of limitations can be taken advantage of by demurrer, when, upon the facts, as stated in the bill, the claim is barred by statute. Story's Eq., p. 757.

In the case at bar, the administrator, Deans, is as such administrator in the possession of the real estate of Jacob Foreman, deceased. He seeks to sell the same for the payment of an alleged debt, due from the estate to his client, the defendant company.

Speaking to this point, Judge Stone, in McArthur vs. Carrie, 32 Ala., 92, quotes with approval the language of Chancellor Dunlin : " The lapse of twenty years is sufficient to raise the presumption of almost anything necessary to quiet the title to property." And he also quotes with approval the language of Judge Chilton : " If a final judgment has been rendered according to the principle of the common law, it would be presumed to have been paid after the expiration of twenty years."

Now if the foregoing propositions are established in the light of common law adjudications, and in the absence of special statutes controlling the settlements of estates, can any doubt exist, as to the duty of the court acting under the legislative policy, looking to the speedy settlement and distribution of estates, disclosed in secs. 12 and 13 of the act of Nov. 10th, 1828 ?

8th. Under the statute of Feb. 16th, 1870, for the sale of real estate of a decedent should the petition to confer jurisdiction on the court to order a sale of the real estate for the payment of debts, allege that the estate was solvent ?

9th. What effect, if any, did the failure of the first pe-

tition, to describe the real estate sought to be sold, and the failure also of the order of the court to describe the same, have upon such sale?

10th. What effect, considered with reference to the statute of limitations as a bar to the heirs of Foreman, did the failure of Elizabeth Foreman to make a deed to the Basses have? Did Sanderson have a right as administrator *de bonis non* to make the deed to the Basses for the purpose alleged therein?

The title to said lands, even if the order of sale were in entire conformity to the statute, and the sale made in pursuance thereof, was not divested out of the heirs, unless and until the conveyance was in fact executed. Bonner vs. Greenless' Heirs, 6 Ala., 411.

The statute, Thompson's Digest, p. 214, provides that where a person agreeing in writing to convey property dies before executing a conveyance, his executors, &c., are authorized to execute such conveyance. If this act applied the agreement of Mrs. Foreman, which is denied, *her* executors or administrators, *not* Jacob Foreman's, could execute her contracts.

As the bill alleges that the possession of said lot did not pass in fact to the alleged purchasers, but in fact remained in the estate of Jacob Foreman, and this fact is admitted by the demurrer, it is obvious for the purpose of this decision, neither the possession nor the title was divested by the sale under the order of Sept. 27, 1856.

Sanderson had no right to make the deed to the Basses in execution of the sale, theretofore made by Mrs. Foreman, his predecessor in office. This record does *not* present the question whether the previous order, and the sale thereunder having been in all respects regular, the Probate Judge *had* the power to perfect the transaction had under such regular order and sale, by ordering the administrator

JUNE TERM, 1889.        1015

Deans, Adm'r, et al. vs. Wilcoxon et al.—Argument of Counsel.

*de bonis non*, or any one else, to make a conveyance to the purchaser.

Certainly the administrator *de bonis non* without such order could not do it for the reason there was no privity whatever between the administrator and the administrator *de bonis non*.

If the predecessor in office of Sanderson received the purchase money of land, sold pursuant to a valid order, duly granted Sanderson as administrator *de bonis non*, was not permitted to call him to account for this purchase money. Gregory vs. Harrison, 4 Fla., 56 ; Beal vs. New Mexico, 16 Wall., 535-40.

A statement of the doctrine of the common law is found in 27 Conn., 344. The administrator *de bonis non* takes the specific property of the deceased, " as the *immediate* successor of the deceased, and never succeeding a prior executor or admininistrator, for which such prior executor or administrator, he has no privity whatever, not even to bring suit in his own name on a judgment rendered in the name of such prior executor or administrator."

But it is for the unadministered assets alone he is responsible ; for the maladministration or other administration of his predecessor he is not responsible. Brownlees vs. Lockwood, 20 N. J. Eq., 239 ; Badger vs. Jones, 66 N. C., 305 ; Ruff vs. Smoth, 31 Miss., 59 ; Bill vs. Spright, 11 Hump., 451.

In Conklin vs. Edgertons' Adm'rs 21 Wend., 448, Judge Cowen declares that in selling lands for the payment of debts, an administrator " is a mere naked agent," without interest, without inherent authority, and a creature of the statute, under which he acts " like the Comptroller, who sells for taxes " and in Leechrist vs. Bask in the successor of a sheriff is denied the right to deed property sold by his predecessor upon the ground—he is a mere agent

without interest, 7 Watts & Lang, 403 ; S. C., 42 Amer. D., 252.

The common law doctrine as to the absence of privity between successive administrators of same estate remained unimpaired in Florida, down to February 19, 1870, Chap. 1733. But this act is limited in its operations and established privity *only* where the preceding administrator has been removed by the Probate Court, for the causes specified in the act, and the common law remains in full force as to a want of privity between an administrator *de bonis non* and a *deceased* administrator-in-chief, or *deceased* preceding administrator.

11. What was the relation of Sanderson to the heirs of Foreman, as attorney in fact for Elizabeth Foreman while she was administratrix of the estate, and his subsequent office of administrator *de bonis non* of Jacob Foreman? Was he a trustee of said heirs ? If a trustee, what effect would that relation have in considering whether Foreman's heirs were barred by the statute of limitations, to as that part of the property which the bill alleges to have been claimed by Sanderson at his death, and of which he was in possession, to wit : Lot 7, block 31 ?

The rule is : The purchaser of trust property takes it subject to the trust attached to it, even though he pays full value for it. Heath et al. vs. R. F. and P. R. R. Co., 4 Grat. 482.

And " persons acquiring property *bound* by trust, with notice of trust, are considered as trustees." Carpenter vs. McBride, 3 Fla., 292.

The legal title to lot 7, block 31 was, as we have seen, not divested out of the estate of Jacob Foreman when Sanderson became administrator *de bonis non* of said estate.

Hence when he became administrator he was in respect of said lot the trustee of an express trust, and he died such

trustee. Hence the administrators of Sanderson, defendants in this suit, took this land subject to the trust, and no lapse of time will bar it. . Amos vs. Campbell, 9 Fla., 187.

In Governor for use vs. Hooker, 19 Fla., 172, this court declared "the possession of the trustees of an express trust is in law the possession of the *cestue que trust,* and there can be no adverse claim or possession during the continuance of the trust. 2 Perry on Trusts, section 863 and notes.

"An executor of a trustee or guardian, by entering upon the administration, takes the property and estate charged with all the trusts attached to them." He is bound by the trusts resting on his intestate or testate, and in this aspect "stands in a double relation."

12. Was the deed to the Basses by Sanderson and their re-conveyance to him one transaction? And if so, did it have the effect to divest the title of the heirs of Foreman to the real estate included?

It was a duty Sanderson owed to the estate he represented when he had made the conveyance to the Basses, to recover the title from them, if any title passed, which is denied; and having thus re-possessed himself of the title, he was remitted to his original relation, and he held it, and the possession of the lot, as the trustee of an express trust, and it became and is the duty of his administrators to surrender this lot, thus charged with an express trust.

The non-resident defendants having, by their solicitor, George Wheaton Deans, appeared, whether to move to dismiss as to them for want of equity, or for whatever purpose, the objection or defence not being followed by plea, answer or other defence, was a voluntary appearance, and relieved complainants of the necessity of publication or subpoena. See 10 Wall, 327.

RANEY, C. J.: I. The complainants, as shown by the statement, claim to be the heirs and distributees of Jacob Foreman, and the parties defendant against whom relief is sought are Hartridge and L'Engle, as administrators of Sanderson, who, at his death, in June, 1871, was administrator *de bonis non* of Foreman, under an appointment made August 6th, 1860, and George Wheaton Deans, as administrator *de bonis non* of Foreman, by appointment made February 21st, 1881, and the sureties on Deans' bond as such administrator, and the Freedman's Savings and Trust Company and Knox, its Commissioner.

(a) The grounds of relief set up as to the administrators of Sanderson are substantially as follows:

The sale of Lot 7, of Block 31, made by Mrs. Foreman, as administratrix of Jacob Foreman, under an order of the Probate Court of September 27th, 1856, and the conveyance of the same and lot 8 by Sanderson, as administrator *de bonis non*, in execution of such incomplete and alleged sale, and the conveyance of said lots to Sanderson individually. It is charged in the bill that lot 8 was never sold by the administratrix, or advertised or offered by her for sale, or reported by her as having been sold, advertised or offered for sale, notwithstanding the recitals to the contrary int he deed from Sanderson, as administrator *de bonis non*, and that the Probate Court had no jurisdiction to order a sale of these lots, as the petition did not allege the exhaustion of personal assets, but on the contrary showed that the personal property had not been exhausted. The claims or demands, for the payment of which the sale was made by the administratrix are also alleged not to have been debts or demands of, nor subsisting debts or demands against Foreman's estate, nor such debts or demands as upon a petition setting up the jurisdictional facts, would make a lawful predicate for ordering a sale of real estate.

It is charged also that Sanderson, upon being appointed administrator *de bonis non*, possessed himself of funds of the estate in the State of New York, amounting to several thousand dollars, and unadministered property in Florida, and that he died without having made any settlement whatever of his administration or any distribution, either partial or final, of Foreman's estate, to those interested therein; and that at his death he was in possession of said lot No. 7, and, claimed the fee thereto, he having, however, on February 7, 1870, conveyed, in his own right, lot No. 8 mentioned above, to the Freedman's Savings and Trust Company. His administrators, it is alleged, have made no settlement of his administration of Foreman's estate.

(b) The grounds of relief against Deans, as administrator *de bonis non*, aforesaid, and his sureties, and the Freedman's Savings and Trust Company, and Knox, the commissioner of such company, are, in brief, that on April 23d, 1881, Deans, as such administrator, petitioned the County Court for a sale of lot 8 to pay Foreman's debts, and on May 6th obtained an order as prayed, and on June 6, one Driggs, as commissioner, appointed by the County Court, exposed the lot for sale, and one Lockwood, the agent of the Freedman's Savings and Trust Company, bid it off at the price of $13,-000, and the sale was reported to the court as having been made to "Augutus E. Bass and the heirs and representatives of Job Bass, deceased." No further action, it is stated, has been taken by the County Court in the premises.

It is alleged: That at or before the sale just mentioned, the Freedman's Savings and Trust Company, or its Commissioner, surrendered the possession of lot 8 to Deans, as such administrator, and that he still retains possession of the same as assets of Foreman's estate, and is receiving the rents and profits of such possession, and that the Trust Company recognizing the invalidity of its title to lot 8, obtained

through the alleged sale by Mrs. Foreman as administratrix, and the conveyance from Sanderson in completion of such sale, and the reconveyance to Sanderson individually, and his deed to the Trust Company, and desiring to acquire the title residing in the heirs of Foreman, procured from the grantors who had conveyed lot 8 to Sanderson, an assignment of the debt subsequently set up by Deans' petition, and procured Deans to take out letters of administration and apply for the sale. That no purchase money has been paid on the bid, nor was any intended to be paid by those making or interested in it, other than a credit upon the alleged debt, for the payment of which the sale was prayed and ordered, and which has been assigned as alleged.

It is charged that at the time of Sanderson's appointment as administrator, there was no valid subsisting debt or claim of any kind against the estate of Foreman; and that the County Court had no jurisdiction in the proceedings instituted by Deans to determine whether or not the alleged debt was established as a predicate for said order, if said debt or claim ever existed, which is denied. The reasons given by the bill for the last allegation are stated in a subsequent subdivision of this opinion.

It is also argued that "if there were valid and subsisting debts at the time of Deans' application for an order to sell, it could not be determined by said County Court that there was a necessity for the sale of the lands for the payment of the debt, or that the personal estate had been exhausted or was insufficient to pay debts, or that the debt exceeded the value of the personal estate, until there had been a final settlement of said administration of Elizabeth, and that of Sanderson in person or by their representatives." When the order was granted (the bill alleges) there was abundant evidence in the files of said court that each of said administrations was outstanding and unsettled.

The bill expressly states, however, that the complainants are willing that the sale made of lot 8 by the commissioner under the order obtained by Deans should stand, provided the Freedman's Savings and Trust Company, or the parties in whose names the bid is reported to have been made, pay into the Circuit Court of Duval county, where the bill under consideration is filed, the purchase money so bid, ($13,000) to be distributed by such Circuit Court to those entitled thereto; and complainants offer to ratify the sale upon the payment of the same to be disposed of by the order of such court.

The prayer as to the administrators of Sanderson especially, is that the sale evidenced by Sanderson's deed as administrator *de bonis non*, conveying lots 7 and 8, be set aside and held for naught; that they fully settle in this court Sanderson's administration of Foreman's estate, and account for all the assets their intestate received, and was or is chargeable with, including lot 7.

The prayer of the bill as to Deans and the Trust Company and Knox specially, is that Deans, as administrator *de bonis non*, account for all the assets he has received and for which he is chargeable, and that the Trust Company, or Knox, its commissioner, pay into the Circuit Court the sum of $13,000, bid for lot 8, or failing therein the sale be set aside and declared of no effect.

The bill also prays for a final settlement and distribution of Foreman's estate, and that the alleged claim of December 20th, 1838, set up in each of the petitions as a debt of Foreman, for the payment of which a sale was sought, whether in the hands of the Freedman's Savings and Trust Company or of A. E. Bass and the representatives of Job Bass, be declared not to be valid and subsisting claim as against complainants, as to said lots 7 and 8, descended to them from Jacob Foreman, or such claim, if valid, as can be enforced only upon

a final settlement of the said Elizabeth Foreman's administration of Jacob Foreman's estate. That upon such settlements, the property, real and personal, of Jacob Foreman's estate, on hand, and the money balance that may be found due said estate, be delivered to complainants, as next of kin of said Jacob, and they be quieted in their enjoyment and possession.

The bill was demurred to by Deans and his sureties as not stating a case entitling them to relief in a court of equity, and as multifarious and by the administrators of Sanderson as multifarious, and as deficient in parties defendant, as the heirs of Sanderson, are not made defendants, and as stating no matter for equitable relief.

The position of the complainants is that they are the sole heirs and distributees of Jacob Foreman ; that his administrix, Elizabeth Foreman, had paid all of his debts prior to her death, and that the Elijah Bass estate claim of December 20th, 1838, was not a subsisting debt of Foreman's estate when the sale made by her took place, and has not since been. They claim that they are entitled to whatever there may be of Foreman's estate existing either in the same form in which he left it, or in the shape of indebtedness by Sanderson's estate, growing out of an alleged devastavit committed by Sanderson.

II. The first question to be disposed of is that as to the jurisdiction of the Circuit Court, as a Court of Equity, in the matter of the settlement of the estates of deceased persons under the Constitution and laws of this State.

The Constitution of 1868 gave the Circuit Courts " original jurisdiction of all cases of equity," and the County Court "full surrogate or probate powers, but subject to appeal;" and it was held in Ritch & Co., vs. Bellamy, administrator, et al., 14 Fla., 557, that in the absence from a case of special equities which the County Court could not adminis-

ter, such court, and the Circuit Court had concurrent jurisdiction in the settlement of estates. That where there has been a suggestion of insolvency, under the statute, in the County Court and creditors have filed their claims, the Circuit-Court should not take jurisdiction of the settlement of the administration at the suit of creditors, in the absence of circumstances calling for the exercise of chancery powers as distinguished from probate or surragate powers, or unless for some special reasons it is made to appear that the County Court could not administer adequate and complete relief between the parties. The bill was filed by mortgage creditors of an intestate, and alleged the existence of other mortgage creditors ; and surcharged and falsified the accounts of the administrator, and alleged waste and neglect upon his part, and that upon a fair and just accounting the estate would be found solvent; and it was held, notwithstanding the complainants had proved and filed their claims in the County Court under the suggestion of insolvency, that the case was one of equitable jurisdiction.

The amendments to the Constitution, which were adopted at the election held on May 4th, 1875, vested the Circuit Court with "original jurisdiction in all cases in equity." * * and with " appellate jurisdiction of matters pertaining to the probate jurisdiction and the estates and interests of minors in the County Courts, and of such other matters as may be provided by law," Section 8 of Article VI; and gave to the County Court " power to take probate of wills, to grant letters testamentary and of administration and guardianship, to attend the settlement of estates of decedents and of minors, and to discharge the duties usually pertaining to courts of probate, subject to the direction and supervision of the appellate and equity jurisdiction of the Circuit Court as may be provided by law," Section 10, Article VI. In Sanderson vs. Sanderson's Administrators, 17

Fla., 820, it was claimed on appeal that the case should be remanded to the County Court. The bill alleged that there had been no final settlement in the County Court, and that no annual settlements had been made, and charged that claims illegal in their character had been paid, also mismanagement of the estate, and prayed, *inter alia*, a distribution, and the proofs disclose that the annual accounts had not been passed on when the bill was filed. The equitable jurisdiction was maintained.

It does not seem to us that the grant of *original* jurisdiction *in all cases in equity* made by the Constitution as amended in the year 1875, was diminished by any other provision of the amendments. The grant by the same section (Section 8, Article VI,) of *appellate* jurisdiction in matters pertaining to the probate jurisdiction, and to the estates and interests of minors in the County Courts, does not take anything from the original equity jurisdiction. The express subjection of the jurisdiction of the County Court, as defined by the quotation above from section 10 of the same article, to the "direction and supervision of the appellate and equity jurisdiction" of the Circuit Court, was not a limitation upon the original equity jurisdiction of the Circuit Court, but a subordination of the powers of the County Court to the original equity jurisdiction of the Circuit Court in addition to that provided by section 8 of the article in question in giving the latter court also "appellate" jurisdiction. In a word, under the Constitution as thus amended, the County Court was not given jurisdiction *exclusive* of the Circuit Court in any matter of administration which a general grant of equity jurisdiction to the Circuit Court would have covered in the absence of such grant to the County Court. This is the theory upon which the jurisdiction of the Circuit Court was maintained in Sanderson vs. Sanderson's Administrators, *supra*. That the Cir-

cuit Court might, under the provision of section 10, referred to above, have been used for *partial* aid or relief to the County Court, is not inconsistent with the view announced above.

Since the proceedings in equity now before us were had there has been a change in the organic law of this State. The new Constitution, Section 11, Article V, gives to the Circuit Court "exclusive original jurisdiction in all cases in equity, * * * and supervision and appellate jurisdiction of matters arising before County Judges pertaining to their probate jurisdiction, or to the estates and interests of minors, and of such other matters as the Legislature may provide." It vests the County Judges (Section 17, Article V,) with jurisdiction of the settlement of the estates of decedents and minors, to take probate of wills, to grant letters testamentary and of administration and guardianship, and to discharge the duties usually pertaining to courts of probate." In future proceedings the powers of the Circuit and County Courts will rest upon the present organic law, and our opinion upon the authorities mentioned above, and those cited in them, is that the original equity jurisdiction of the Circuit Court as it existed before, is not impaired by the new constitutional provisions. Teague et al. vs. Corbitt, 57 Ala., 329 ; Deck vs Gerke, 12 Cal., 433.

Assuming that the case made by the bill is one entitling the complainants to any relief, we are satisfied it is one for equitable relief.

III. In considering the merits of the case presented by the bill against Deans as to lot 8, it is to be observed that the demurrer admits that the lot was neither sold nor offered for sale by the administratrix under the order of sale of September, A. D. 1856, and hence it would be entirely improper to discuss, in connection with this lot, the question of the jurisdiction or power of the Probate Court to

make the order. If there was no sale of the lot under the order, the conveyance of it by Sanderson, as administrator *de bonis non* was without authority of law, and the title of the Trust Company would depend upon its purchase and deed of conveyance from Sanderson and possession thereunder. The effect of such purchase and conveyance and possession thereunder cannot, however, be considered upon a record like this, asserting, without denial or explanation, that the company, recognizing the invalidity of its title, had delivered the lot to Deans, as administrator, and that he holds it as assets of the estate of Foreman.

In view of the admission of the demurrer that no sale was made of this lot by the administratrix under the order of 1856, no benefit can be claimed of the provisions of the "Act to quiet titles to real estate," approved March 11th, 1879. (Chapter 3, 134). If there was no sale made there are no "purchasers," or "assigns" of purchasers to invoke the five-year limitation or other provision of this statute.

The admissions referred to in the two preceding paragraphs are also inconsistent with a contention upon the part of a Trust Company of having acquired title by adverse possession for seven years under claim of its title from Sanderson, at least so long as the record remains in its present condition.

IV. The next feature of the case is the sale of the above lot 8, made June 6th, A. D. 1831, by Driggs, the Commissioner named in the order of sale entered by the County Court of Duval county May 6th of the same year, on a petition filed by Deans, administrator *de bonis non*, on the 23d day of the preceding month.

The petition alleges that there "is no personal property of the intestate not administered upon," and that the lawful debts and demands now existing against said estate

amount to the sum of $22,265.   The debts are stated in an annexed schedule as follows :

Amount due Augustus E. Bass and Job Bass, sole heirs of Elijah Bass, deceased, as per probated account, approved and filed in the probate records of this county of Duval, State of Florida, on June 16th, 1856, and to which reference is hereby made for date and evidence, of said account and amount due...... $28,620.00

Less amount received by Augustus E. Bass and Job Bass from said estate.................. 6,555.00

Balance due.......................... $22,065.00

Estimated expenses of sale, probate fees and commissions................. ................ 600.00

$22,665.00

The petition prays for the sale of a lot of land situate in the City of Jacksonville, county of Duval and State of Florida, known as lot 8, in block 31, in the plan or plot of said city, and located upon and contiguous to the southwest corner of Forsyth and Pine streets, at their intersection in said city, valued, with and including lot 7, so-called upon said plan or plot in said block and adjoining said lot 8, in the appraisement of property of said estate filed among the probate records of said county on June 20th, 1856, to which reference is made, at (with improvements) $3,500.

The order recites the fact of the filing of the petition, and that it appears by the petition and annexed schedule that there are debts against the estate, and " no means of paying the same · or any part thereof without recourse to the real estate, the personal property of the said estate having been exhausted." It orders a sale of all the estate, right, title and interest of the estate of Jacob Foreman, in and to

lot 8, appoints John S. Driggs a commissioner to sell, directs him to make written report of the sale, and to make no conveyance until the sale shall have been confirmed by the County Court.

At the sale by Driggs on June 6th, 1881, one Lockwood, the agent of the Freedman's Savings and Trust Company, bid off the lot at the price of $13,000, and the sale was reported to the court by the commissioner as having been made to "Augustus E. Bass and the heirs and representatives of Job Bass, deceased." The County Court had neither confirmed the sale nor taken any action thereon when the bill was filed.

It is contended that under the act of February 16, 1870, Chap. 1732, Pamphlet Laws, Section 40, p. 86, McClellan's Digest, an allegation of the solvency of Foreman's estate was essential to the jurisdiction of the County Court to order the sale of the real estate. The fourth section of this act provides that when the estate is *solvent*, and the debts and charges due and owing by an interstate estate, or by a testate estate in the absence of certain provisions from the will, "shall exceed the value of the personal estate, and the persanal estate shall have been exhausted, or is insufficient to pay the debts and charges," a sale of the real estate may be had. Chapter 3016, approved February 27th, 1877; Section 12, p. 584, McClellan's Digest, provides *inter alia* that "lands, tenements and hereditaments belonging to an insolvent estate, after the suggestion of insolvency, shall be sold under the same proceeding now required to sell lands belonging to an estate to pay debts."

The same objection to these proceedings was made by the appellee's counsel in Deans, administrator *de bonis non*, appellant, vs. Wilcoxon et al., appellees, 18 Fla., 531, and was held by this court not to be good. The ruling there is that as no such allegation is expressly required by the statute,

and the jurisdiction of the County Court extends to sales of land of both solvent and insolvent estates, it is sufficient if it appear that there is an estate, and the facts necessary to give jurisdiction in the case of either a solvent or an insolvent estate are set up in the petition. We see no error in this conclusion—even assuming the question to be *res integra*. The allegations required by section 4 of the act of 1870, *supra*, will give jurisdiction whether the estate be solvent or insolvent; and if insolvent, whether it has not or has been formally suggested to be insolvent. An inquiry as to the solvency is not jurisdictional, and the fact does not have to be averred in the petitition.

The statement of the petition is, that "there is no personal property of the intestate not administered upon," and the order adjudicates that the personal estate had been "exhausted." This being so, the County Court had, as against a collateral attack, jurisdiction to act in the matter of the sale of the real estate. Hays vs. McNealy, 16 Fla., 409; Emerson vs. Ross, 17 Fla., 122; Sloan vs. Sloan, 25 Fla.; S. C., 5 So. Reporter, 603; Deans vs. Wilcoxon, *supra*.

(b). Being satisfied that the County Court had jurisdiction to act in the matter, of the order of sale May 6th, 1881, the inquiry now is whether or not the other grounds of complaint against the order are of such a character as, under the principles of law controlling in such cases, will authorize an arrest, through the instrumentality of a bill in equity, of further proceedings by the County Court under its order.

One complaint of the bill is as to the indebtedness or claim for the payment of which the order of sale was made.

The petition of Deans avers that the lawful debts and demands existing against the estate amount to the sum of $22,665.00, "as appears by the schedule annexed," made part of the petition. The statement of debts in this sched-

ule is given in the second paragraph of this subdivision of this opinion.

It is evident from the bill that the above Bass claim is the same as that described in the schedule to the petition of Mrs. Foreman administratrix as follows : " 1838, Dec. 20. Account filed and proved due estate of Elijah Bass, deceased, $28,620."

The bill in treating of the order of sale obtained by Mrs. Foreman, in September or October, 1856, says that the claims or demands for the payment of which the sale was prayed, were not debts or demands against said estate, and were not such claims or demands as upon a petition setting up the jurisdictional facts could be made a lawfull predicate upon which to order a sale of real estate, nor were they, or either of them, subsisting claims or demands against the estate of Foreman ; and it is also alleged in connection with the order of sale procured by Deans, May 6th, 1881, that at the time of Sanderson's appointment as administrator, which was August 6th, 1860, there was no valid subsisting debt or claim of any kind against the estate of Foreman, for which the assets of his estate in the hands of Deans, as administrator *de bonis non*, could or ought in law or equity to be liable, nor was Deans liable or compellable to pay the Bass claim, or any other in his capacity as such administrator. There also occurs in connection with an allegation that the County Court had no jurisdiction in the Deans proceeding to determine whether or not the Bass claim was established as a predicate for the order, if said debt or claim ever existed, a denial of its existence in the usual form of such denials, *i. e.*, " which is denied."

Of course the allegation that the administratrix paid off and discharged, through her attorney, and without suit, abatement or delay, all the lawful claims and demands

of the estate, does not include the Bass claim as one so paid.

What the evidence or proof of the validity of this claim on file in the Probate Court, and which the Probate Judge in 1856, and the County Judge in 1881, had before them, and by which they were satisfied of its validity is, we are not informed. It is certain that it was such as to satisfy them of its validity in law as a claim against the intestate's estate, and that it was of such a character as to authorize a sale for its payment. This evidence, whatever it may be, is by the terms of Deans' petition and schedule, referred to as proof of the claim, and it is to be conclusively presumed that the County Judge considered it in the deliberations which resulted in his order of sale. Any other presumption would impute dereliction of duty. The sufficiency of the evidence is not jurisdictional. Robinson vs. Epping, 24 Fla., 237 ; S. C., 4 So. Reporter, 812 ; Sloan vs. Sloan, 25 Fla.; S. C., 5 So. Reporter, 603 ; Price vs. Winter, 15 Fla., 106, 107 ; Comstock vs. Crawford, 3 Wall., 396 ; Florintin vs. Barber, 2 Wall., 216 ; Grignon's Lessee vs. Astor, 2 How., 319 ; Morrow vs. Weed, 4 Clarke, (Iowa) 77 ; Carter vs. Waugh and wife, 42 Ala., 452 ; Stow vs. Kimball, 28 Ill., 93 ; Morse vs. Neil, 39 Ill., 256 ; Hobson vs. Ewan, 62 Ill., 146 ; McClellan's Digest, Section 40, p. 86.

Assuming, as we well may, that when an order of sale has been made a County Court, acting upon a petition which gave it jurisdiction to act or decide in the premises, the heirs of the intestate can, by a proceeding in a court of equity, arrest the execution of such order on the ground that the indebtedness upon which the Court has acted is not a valid debt of the estate, the burden is upon them to show by their bill of complaint or other proper pleading that the debt is not valid. The order of the County Court

is, under the circumstances indicated, at least *prima facie* legal as to the indebtedness, and to invoke the aid of chancery, the heir must state in his bill facts in relation to the alleged indebtedness which, if true, will overthrow the *prima facie* presumption created by the order. General averments of conclusions of law will not do. To say that the claims or demands, for the payment of which a sale was prayed, were not debts of the estate, or were not such claims or demands as could be made the lawful predicate of an order, or were not subsisting claims or demands against the estate, or that there was no valid subsisting debt or claim against the estate, for which the assets in the hands of the administrator *de bonis non,* could or ought in law or equity to be liable, or that such administrator was not liable or compellable in law or equity to pay the alleged claim, is but to aver a conclusion of law, the contrary of which the order itself affirms.

If the original valid existence of the claim is admitted, and a satisfaction of it by payment, or otherwise, is relied upon, this new matter, whatever it may be, should be specifically averred. If, on the other hand, the claim never had any existence, but is the creature of fraud upon the part of the owner of it, to which fraud the administrator is either a party or an innocent victim, or is otherwise invalid, such fraud or invalidity whatever it may be, should be explicitly charged. The alleged debt must in all cases either have been originally valid, or be a creature of fraud or otherwise of no validity. If courts of equity could be invoked to inquire into the validity or propriety of the action of the County Courts or any other principle of pleading than this, or upon a mere assertion of their invalidity or non-existence as subsisting claims, not only would there be no limit to the applications to them for such inquiries, but they would enter upon their investigations, not as in

ordinary cases, to inquire into the facts of a particular charge invalidating it, and apply the law to the same, but to first explore and find out what specific charge could be made or formulated.

The allegations set out above are clearly demurrable as no facts to which the law can be applied, on a demurrer, as a test of the validity of the indebtedness or orders of sale.

(c.) The doctrine of laches and staleness of claim is invoked by both complainants and defendants in this cause, and in addition, the complainants contend that the Bass claim had become barred by the statute of limitations prior to the death of the intestate, Jacob Foreman, or when the first order of sale was made; whereas the defendants assert that the claim was not affected by any bar of the statute, for the reason that the claimants, the Bass heirs, were residents of the State of Louisiana, where the cause of action accrued.

The statute of limitations of November 10th, 1828, originally made an exception in favor of persons who were, at the time certain causes of action accrued, either within the age of twenty-one years, *feme covert,* imprisoned, " *beyond the seas, or out of the country,*" but in 1846 the Legislature enacted that the saving clause in the statute mentioned, and all other acts of limitation, in favor of persons " beyond the seas or out of the country " until such persons shall have returned, shall not extend to persons who were not at the making of the contract or accruing of the cause of action domiciled or resident within the limits of this State. It is not pretended by defendants that the Bass heirs were so domiciled or resident. This amendatory law of 1846, section 2, page 443, Thompson's Digest, was in force when Foreman died in March, 1856, as well as when the order of sale of the following September was made, and in fact un-

til the suspension of the several statutes of limitation, on January 10th, 1861 ; and the above statement of it is a sufficient answer to any contention of defendants based on the previous exception of the statute in favor of " persons beyond the seas or out of the country."

Addressing ourselves to the question of the staleness of the Bass claim as urged by the appellees, or complainants, we find from the amended bill and exhibits that in the exhibit to the petition filed by the administratrix in June, 1856, this claim is described as account of December 20th, 1838, for $28,620, filed and proved as due the estate of Elijah Bass. This is clearly the meaning of the terms used, as they appear in the preceding pages of this opinion, and there is no doubt as to the identity of the claim described in each sale proceeding, it would seem from the description of it that it originated December 20th, 1838, or about seventeen years and three months before the death of Foreman, and seventeen years and six months before the filing of the petition by the administratrix.

The contention of complainants is, that the presumption of law is that this claim had been satisfied. He invokes the twelfth section of the above act of November 10th, 1828, section 1, page 444, Thompson's Digest; section 71, page 96, McClellan's Digest, by which it was provided that if any suit be brought against any executor or administrator or other person having charge of the estate of a testator or an intestate for the recovery of a debt due upon an open account, it shall be the duty of the court before whom such suit shall be brought to cause to be expunged from such account every item thereof which shall appear to have been due five years before the death of the testator or intestate. It had a saving clause of three years after removal of the disability, in favor of all plaintiffs *non compos mentis*, *feme covert*, infants, or imprisoned ; that as to persons " out of

the State," having been repealed by the above act of 1846.

This provision was mandatory, and, when applicable, devolved upon the court the duty which it sets forth, " without reference to the state of the pleadings." Patterson vs. Cobb, 4 Fla., 481, 487, 488.

If it be that this section applied to a case like the one before us where the administratrix was seeking the action of the court in a manner that implied her satisfaction with the validity of the claim, we think it must be assumed, in the absence of affirmative showing to the contrary, that the Judge of Probate made the inquiry in 1856, and found that the claim was either of such a character that the statutory bar did not apply to it, or that it had been taken out of the bar by a subsequent promise of the testator within the five years next preceding the death of Foreman, or that the parties owning it were infants or under some other one of the disabilities in favor of which the statute makes a saving.

Whether we consider the case in connection with the statute referred to, or independently of it, and as governed by the equitable principle of the bar which the lapse of time makes to the enforcement of claims, the conclusion we reach upon the pleadings before us as to this Bass claim having been barred before the presentaion of it to the administratrix is adverse to the complainants. They are in the equitable proceeding now before us the actors, and their position is this: In 1882, about twenty-six years after the death of Foreman, and the same period after the presentation of the claim to the administratrix and its recognition by her and by the Probate Court as a valid claim against the estate of Foreman, and about twenty-five years after the death of Job Bass, and twenty-two years after the death of the testatrix, and about eleven years after Sanderson, who was the attorney of the administratrix during her

administration, and who succeeded her as administrator *de bonis non* in 1860, had passed away, they are asking that the claim so recognized, and upon which a payment of over six thousand dollars had been made, shall be adjudged not to have had any legal existence againsts the estate at the time it was either so acknowledged or partly paid. Of the parties who appear to have known anything of the merits of the claim, all but one are shown to be dead.

If we view the assault upon this claim in its application to the proceeding instituted by Deans for the sale of lot 8, our conclusions are also adverse to a presumption of its payment, on the score of the lapse of time since the recognition of it by the administratrix. It is the adjudicated law of this State that when a claim is duly presented or exhibited to an executor or administrator, under the statute of non-claim and not denied by him as being a good claim against the estate of his testator or intestate, the general statute of limitation ceases to run against it. Sanderson's Administrators vs. Sanderson, 17 Fla., 820, 850-2; Bush vs. Adams, 22 Fla., 177; McDonald vs. Bogue, 16 Fla., 363. The validity of this claim as of the day of its presentation to the administratrix, duly proved as it seems to have been, not having been effectually assailed, we do not see that subsequent events have been such as to render it stale and the subject of adjudication that it is barred as against the lot last named. Any presumption that might arise upon the face of the bill against the claim from the delay from October, 1856, to the death of the administratrix in 1860, and from then to the year 1870, in consummating the sale of lot seven, is overcome by the partial payment made on it, and the subsequent, at least *de facto*, consummation of the sale of lot seven; and moreover, we are to remember that during four years of this time subsequent to 1860, the country was in a state of war, and for a

long period subsequent to the cessation of actual hostilities, business was either actually suspended or greatly paralyzed. The delay in carrying out the sale of lot seven is unexplained by the pleadings, and in the absence of explanation, is imputable at least as much to the administratrix and her successors, as to the creditor.

The only information we have of the condition of the estate at the death of Foreman is that given by the schedule of debts and demands and assets forming a part of the petition of the administratrix, and from this it is evident that the estate was insolvent, allowing the widow one-half of the personal property in fee simple, except slaves, and in those to a life estate, and to one-third of the reality for her life. Even if we should assume that all the estate set forth in the schedule mentioned had been collected by the administratrix and administrator *de bonis non* and applied to the widow's dower and to the indebtedness, there would still be a balance of this claim unpaid; but it is not contended that this has been done. The allegations of the bill are such as to exclude the idea that any other payment than that of $6,555 has in fact been made on the claim out of the assets of the estate.

Upon the face of the bill it appears that in 1881 Deans, as administrator *de bonis non*, had come into possession of property of the estate, lot 8, which has in law never been administered upon. This is ten years after the death of Sanderson, his predecessor, who, a year before his death, had recognized the indebtedness as existing. The evidence of the claim remains on file in the Probate Court, where it has been all the time. The dealing of Sanderson with this property in 1870 was, unless we voluntarily impute corrupt motives to the owners of the claim, such as to lead them to believe that Sanderson was then lawfully recognizing it as a valid indebtedness of Foreman's estate. From

the time Sanderson, as administrator *de bonis non*, made the deed in 1870, till the institution of the action of ejectment by the heirs of Foreman to recover lot 8, this being, in the language of the bill, "before Deans filed the above petition," it does not appear that there was any necessity for action in this State on the part of the owners of the claim, or if any, that it was known to them.

Complainants invoke also section 72, page 97, McClellan's Digest, section 13, act of November 10th, 1828, which, omitting the saving clause, is to the effect that no action of debt shall be brought against an executor or administrator upon a judgment obtained against his testator or intestate, nor shall any *scire facias* be issued against any executor or administrator to revive such judgment after the expiration of five years from the qualification of his executor or administrator, and all such judgments after the expiration of five years upon which no proceeding shall have been had shall be deemed to have been paid and discharged. This statute, if it be in force, upon which point we say nothing, does not apply to the case before us. We are not dealing with a judgment rendered against Foreman in his life time, and upon which no action had been taken by the judgment creditor for five years next after the qualification of the adminisiratrix. In Sanderson vs. Sanderson, 17 Fla., 850, this court said : "It has been the practice in this State since its organization to require of a creditor nothing more than the presentation or exhibition of his claim to the administrator. This stopped the operation of the statute of limitations and of non-claim. It has never been held in this State that the creditor after presentation must reduce his debt to a judgment. * * The accumulation of unnecessary costs and the sacrifice of the interests of heirs would be the natural result of such a policy." 40 Miss., 716 ; 29 Wis., 64. Independent of the effect which

the presentation of this claim to the administratrix had upon the statute of limitations, the running of the statutory bar would have been stopped by the act of January 15th, 1861, suspending the statute of limitations " in relation to civil actions." Section 3, chapter 1271, Laws of Florida, 1860. Hart vs. Bostwick, 14 Fla., 162; McDonald vs. Bogue, *supra*. This suspension continued for some time after Sanderson's appointment as administrator *de bonis non*. The enactment of the limitation act of February 27th, 1872, to be found in McClellan's Digest, did not do away with the effect of the presentation to the administratrix. The conduct of the administratrix and of Sanderson as to the claim are, under the allegations of the bill, irreconcilable with the idea of its having become stale or barred, or with a presumption of its actual payment while they were such administrators.

In McArthur vs. Carrie's Administrator, 32 Ala., 75, cited by counsel for appellees, an administrator in Mississippi had in 1828, made a sale of a slave. Under the statute law of the latter State, administrator's sales were void if not public. Twenty-three years after an administrator *de bonis non* began an action to recover the slave and her increase. The testimony as to whether the sale was public or private was irreconcilably conflicting. The records of the Probate Court had been burnt, and the various persons who had held office in that court differed essentially as to what those records disclosed. From the time of the sale until March, 1853, when a few months before the commencement of the action, the slaves were removed to Alabama, they remained all the time in the neighborhood in which they were sold, and in the independent and undisputed possession of the purchaser, McArthur, and his son, the defendant. It was held by the Supreme Court of Alabama that proof of uninterrupted adverse possession of personal

property for twenty years raises a *prima facie* presumption of title and ownership which can only be overturned by proof showing that such possession is not inconsistent with the plaintiff's right or explaining and excusing the long acquiescence on some other ground than original defect of title in the possessor.

The Alabama court in this case uses approvingly the expressions in other opinions that " the lapse of twenty years is sufficient to the presumption of almost anything necessary to quiet the title to property ;" and " if a final judgment had been rendered, according to the principle of the common law, it would be presumed to have been paid after the expiration of twenty years, and if the parties allow this period to lapse without taking any steps to compel a settlement, we think the presumption of payment arises, and the executor or administrator should be exempted from the necessity of hunting up evidence to prove accounts and vouchers which ordinarily enter into such settlement." Rhodes vs. Turner, 21 Ala., 210 ; Sims vs. Aughtbery, 4 Strob. Eq., 103 ; Barnett vs. Torrence, 23 Ala., 463 ; Gantt's Administrator vs. Phillips, Ibid, 275.

Bird's Administrator vs. Inslee's Executors, 8 C. E. Green, 363, which is also relied upon by complainants, was a case in which Bird had obtained a judgment against Drake, and levied execution on a farm which Drake had, prior to the judgment, conveyed to Inslee. Subsequently to the levy Bird filed a bill in October, 1847, to set aside the deed as being fraudulent against his judgment, and over *twenty years* afterwards Bird's administrator sought to revive the suit against Inslee's executors. By the statute of limitations twenty years barred either a *scire facias* or an action on the judgment, and it was held on demurrer to the bill that payment of the judgment was to be presumed from the lapse of twenty years.

The distinction between the cases relied on and the one before us is, that in the latter there has been no continuous period of twenty years within which the Bass claim has not been specifically recognized by the representatives of the estate of Foreman as valid and subsisting.

There is nothing in the case of Teague et al. vs. Corbett, Administrator, 57 Ala., 529, decided in 1877, which conflicts with our conclusions. The facts there were in short that the administrator has orally pleaded the statute of limitations and judgment had gone against him in 1870, on a promissory note owned by his partner, and signed by his intestate and another, and had settled the judgment, and he claimed reimbursement out of the proceeds of real estate of his intestate. The heirs who resisted the claim were permitted to show that his defence of the plea of the statute of limitations in the action of the note, which defence he conducted in person, was negligent, both in not requiring proper proof by the plaintiff, and in not using accessible evidence to prove that it was barred as to the intestate; and they were allowed to show that the note was in fact barred as to his intestate, and he was denied the reimbursement. A judgment in favor of a creditor, and against an administrator, is held to be *prima facie* evidence against other creditors and distributees of the validity of the demands on which it is founded and of his liability to pay it; but it is not conclusive evidence, and other creditors and the distributees may, when he claims a credit for payments made on it, show the invalidity of the demand, and that the judgment was the result of his laches in making the defense. And though to this general principle the exception prevails there of not requiring an administrator to plead the statute, and a failure to interpose such a plea does not deprive him of the right to reimbursement out of the personal assets, yet it

was decided, that when he does plead it he must exercise the same degree of dilligence that would be required in making any other defence, and especially when he stands in intimate and confidential relations to the creditor. It was also held that there is no privity between the administrator and heir or devisee as to the real assets, and they cannot be bound by any admission or acknowledgment of the administrator, and further that if an administrator pays a judgment, and claims reimbursement from the real assets, the heir may protect himself by showing that the debt upon which it was recovered was barred by the statute of limitations.

(D.) It is also urged in the bill that the County Court had no jurisdiction to determine, *in the proceedings instituted by Deans*, whether or not the alleged Bass claim " was established as a predicate " for the order granted therein, or to determine whether such claim was a valid subsisting debt *when administration was originally granted on Foreman's estate*.

The reasons given in support of this contention are two : 1st, that inasmuch as Job Bass and Augustus E. Bass were sureties on the administration bond of Mrs. Elizabeth Foreman, and were alleged to be the beneficial owners of the claim, it could not be determined by the County Court whether or not the said Elizabeth and her sureties were indebted to Foreman's estate, until there was a settlement of Mrs. Foreman's administration by herself, or by her personal representative, Augustus E. Bass. 2d, that inasmuch as Mrs. Forman succeded under the will of Job Bass, which was probated May 27th, 1857, to the claim, if it was at that time a valid and subsisting debt, as co-owner thereof, the right to receive and the duty to pay were united in the same person and thus was extinguished by operation of law, and her status as a creditor or a debtor

of the Foreman estate was made dependent upon, and could be determined only by a final settlement of her administration.

As to the first proposition, the Probate or "County Court" could have told from the administrator's accounts whether or not the administrator was indebted to the estate, and if so, it would have been its duty to refuse to make a sale of real estate to pay a debt held by the sureties on her bond, if such sale would injure the rights of other creditors, or the estate was solvent and it would consequently injure the heirs.

The fact that Mrs. Foreman was at the same time joint owner of the claim, as well as administratrix of Foreman's estate, did not of itself extinguish the claim, even to the extent of her interest, nor would such have been the result had she been sole owner of it, Wankford vs. Wankford, 1 Salkeld, 299, 305; Hall vs. Pratt, 5 Ohio, 73; Lowe vs. Peskett, 16 C. B., (81 E. C. L.,) 500. Nothing was decided on this point in the case of Ragland vs. Calhoun, 36 Ala., 606, cited by counsel for appellees. It is true that parties urged there that where a debt and a credit—a right to demand and an obligation to pay—co-exist, even for a moment, in the same person, the debt is extinguished by the presumption of its payment, but "the ultimate decision of the interesting question here suggested," was, in the language of the opinion, left "open to be decided when it arises," the court "not intending by anything * * said" (and it had merely given the argument and authorities) "to intimate an opinion the one way or the other," yet stating that on account of a certain decree of the Probate Court, by which the parties referred to were concluded, the principles could be of no avail to those in whose behalf it was urged. The only one of the decisions cited by

the Alabama court that we have access to, is that of Enicks vs. Powell, 2 Strob. Eq., 196, and it gives an administrator *de bonis non* a relation to the administration in chief that does not obtain in this State unless it be in cases of removals under the statute of 1870, referred to in a subsequent subdivision of this opinion.

(E.) The bill also contains allegations as to the Trust Company and Deans, in relation to the administration of Deans, and his application for the order of sale, the sale itself, and the intention of the Trust Company, which it is necessary to notice. They, as set out in the following three paragraphs, are:

(1.) That the Trust Company recognizing the invalidity of its title to lot 8, and desiring to acquire title thereto, procured from the grantors in the deed to Sanderson an assignment of the claim alleged to be due by the estate of Foreman, and upon which the subsequent order of sale obtained by Deans, as administrator *de bonis non*, was based, and also procured Deans to sue out such letters of administration, and to make application for the sale of the lot to pay said debts; that Deans, when he applied for letters of administration, had no connection with Foreman's estate or any alleged claim due from it, or any interest in, or connection with the lot of land except as the attorney of the Trust Company, or its Commissioner, which relation of attorney he occupied at the time the letters of administration were granted and still occupies.

(2.) That at the sale of June 6th, 1881, under the order of the County Court, one Lockwood, the agent of the Trust Company, bid it off at the price of $13,000, and the sale was reported to the County Court, by its Commissioner, Driggs, as having been made to " Augustus E. Bass, and the heirs and representatives of Job Bass, deceased," and no further action has been taken by that court.

(3.) That no purchase money was paid on the bid, nor was it intended by those making it or interested therein, that any payment in cash should be made, or that any payment of the bid should be made other than crediting the amount bid, as cash upon the alleged debt, for the payment of which the sale was made; it being, according to the statement of the bill, immaterial to the parties making the bid or interested therein whether the bid so reported and the sale thereon, were confirmed by the court to the Trust Company, by whom the bid was really made through its agent Lockwood, or to said A. E. Bass, and the heirs and representatives of Job Bass; the reason of such immateriality or indifference on this point being that by the operation of the warranties in the deed to Sanderson, and that from Sanderson, the deed of the County Court Commissioner executing the sale would enure exclusively to the Trust Company whether the sale was confirmed to such company or to those whom the commissioner had reported as purchasing. That the whole purpose underlying the application by Deans for administration, and the proceedings had by him to effect a sale of the lot will be accomplished, and complainants defrauded by having the amount of the bid credited on or applied to the parties in whose name it is reported as having been made.

If the Trust Company was the holder of a valid claim against the estate of Foreman, there was nothing improper in its procuring the appointment of an administrator *de bonis non* to take possession of and administer any unadministered property of the estate—which status the bill gives to this lot 8. That the company " procured " Deans to sue out letters and to make application for the order of sale to pay the alleged debt, does not, considering how it is alleged, impute any illegal conduct to the company of Deans, but if, when he was applying for such order, he was the

attorney of the company, or its commissioner, as such, for the enforcement of this claim against the estate or to procure its payment out of the lot, or to obtain title to the lot through the means of a sale based on the claim as a subsisting indebtedness of the estate, the duties of such relation, and those of administrator were, to say the least, incompatible with each other, and .if such relation to the company is neither expressly nor impliedly assented to by them, they ought not to be bound by his action in regard to the sale. "If," says this court in Knox *et al.* vs. Barnett, 19 Fla., 817, 839, " the administrator here is the attorney of the creditors, he has assumed a position of hostility to the heirs. If he represents the debt it is his duty not to contest it, which it is his duty to the heir to do if there is legal ground for so doing * * *." That it would be a ground for removal from the administratorship in the proper forum can hardly be doubted. *Ibid* ; Epping, Bellas & Co. vs. Robinson, 21 Fla., 36.

But what is the real status of complainant as shown be their bill to this sale. They expressly state that they are willing that the sale made by Driggs should stand, provided the Trust Company or parties in whose name the bid is reported as having been made, pay into this court (i. e., the Circuit Court of Duval county, sitting in chancery) to be distributed to those entitled thereto, the purchase money so bid, and they offer to ratify the sale upon such payment being made of the purchase money, to be disposed of by the order of the court. The prayer of the bill on this point is that the Trust Company, or Knox, its commissioner, pay into the Circuit Court the sum of $13,000, bid for lot 8, to be disposed of by the court, or failing therein, that the sale be set aside and declared of no effect.

If the sale is voidable because of the invalidity of the indebtedness upon which it is based, it must be avoided alto-

gether and as to all parties in so far as any action of the court is concerned. An invalid proceeding for the sale of real estate to pay debts cannot be declared void or set aside because of the invalidity in the alleged indebtedness, the creditor *being the purchaser, and yet held as against the purchaser's will to be a valid sale for the purposes of division among the heirs of the estate, particularly in case where actual fraud is not charged. Knox vs. Spratt, 19 Fla., 837. We have held that it is not voidable by reason of illegality in the Bass claim, or in other words, that the bill does not show the claim to have been invalid. This being so, the conclusion is that the heirs have not by their own showing, suffered any injury on this score from the relation alleged to have been sustained by Deans to the Trust Company. It is also clear from the above proposition and prayer of the bill, that the complainants are satisfied with the amount for which the property has been sold, and they have not suffered from the sale actually made by the Commissioner. The claims for which the sale was made not having been shown to be illegal, and the sale having been made for an amount satisfactory, it is apparent that the heirs, even if they have any interest in the estate, have not been injured by the proceedings up to this point.

The bill does not, in the above paragraphs numbered (2) and (3), or elsewhere, inform us that the company, or its commissioner, was not authorized by "Augustus E. Bass, and the heirs and representatives of Job Bass," to bid in their name, although it says that the bid was really made by the company, through its agent, Lockwood. The purchasers, shown by the commissioner's report, are the Basses. We will not assume that the party actually making the bid was not authorized to do so. If those really making the bid comply with it and take the titles in the names of the Basses, it is a matter of no concern to the heirs or any

other third parties, whether the Basses authorized the bid or not.

Of the allegations as to the intentions of those making the bid or interested therein not to make any payment therein other than a credit of the amount thereof on the Bass claim, it is only necessary to say that we do not regard them sufficient of themselves to justify interference on the part of a court of equity. As the order of sale has not " otherwise directed, " the sale was in law, and must be assumed to have been in fact made " for cash; " section 30, p. 87, McClellan's Digest; and of course the commissioner will, if the sale shall be confirmed by the County Court, not deliver any deed to the purchaser except upon the order of the County Court directing it to be done upon the purchasers' compliance with the terms of the sale. Section 43, pp. 89, 9 ). McClellan's Digest. The funds arising from the sale, says the statute, section 43, p. 90, shall be delivered by the commissioner to the administrator upon the order of the court after the administrator has given the " bond with good security, to be approved by the court, " required the condition of which bond is, section 40, p. 87, for the faithful application of the money to the payment of the debts and charges. It is not to be assumed that either the County Court or the commissioner will violate the duties imposed by the statute; nor is that court without power to require obedience to its lawful orders.

Our conclusion is that the bill fails to make a case against Deans, or any one connected with the sale of lot No. 8, under the order of the County Court.

V. It is contended in behalf of Sanderson's administrators that the heirs of Foreman have no right to sue for lot No. 7, but that if the bill shows a right of action in any one, it is in Deans, as administrator *de bonis non*, because the lot is an unadministered asset of Foreman's estate. The au-

thorities cited by counsel in support of this position are 2 Williams on Executors, 986, 1002 ; Cubbidge vs. Boatwright, 1 Russell Chan. Cases, 549; Forniquet vs. Forstall, 34 Miss., 87 ; Cochran vs. Thompson, 18 Texas, 652 ; Swink vs. Snodgrass, 17 Ala., 653.

It is said in the first of the citations : " If, however, an original executor has fradulently aliened an asset for his own use in collusion with his vendee, such asset will be regarded in equity as unadministered, and will pass as such to the administrator *de bonis non.* "

In Cubbidge vs. Boatwright, the testatrix, Mrs. Cubbidge, directed by her will that certain property, including a leasehold, should be sold and the proceeds paid to her four children share and share alike. Her administrator *cum testamento,* Higginson, a son-in-law, possessed himself of the property and assigned the leasehold to H. upon trust to secure an annuity which H. had granted to B., the consideration for the annuity being £250, which B. had advanced to H. confessedly for the private use of the latter, and not for the purposes of the testratrix's will. The trust deed recited that the lease and leasehold premises had, with the consent of the other legatees, been valued to H. at £570, and that he had duly paid to them their several shares of that sum, but that there was no proof of this or of any other arrangement authorizing H. to deal with the leasehold as his own property. H. died and his executrix sold the leasehold at auction, B. becoming the purchaser, and the £250 was credited on his bid. Shortly after B. sold to Bayfield, and afterwards the administratix *de bonis non* of Mrs. Cubbidge filed a bill and had the sales set aside and recovered the leasehold. "If Higginson," says the Master of Rolls, "in this character of executor, had sold the property to Boatwright, and Boatwright had been ignorant of the real nature of the transaction, the sale could not have been set aside. But it is

clear that this leasehold, at the time when the grant of the annuity took place, was vested in Higginson only *qua* administrator, and that the grant of the annuity to Boatwright, and the assignment in order to secure the annuity, were not acts done by him in his character of administrator, or in the course of the administration, of the assets. Upon Higginson's death, therefore, no portion of this leasehold interest passed to his executrix; but being still assets unadministered, it passed to the administratix *de bonis non* of the original testatrix; and she is entitled to recover possession of it for the purpose of due administration." In Forniquet vs. Forstall, the administrator had land bid off at a probate sale in the name of his brother-in-law nominally, but in truth for himself. Subsequently he was removed as administrator, and the administrator *de bonis non* filed a bill to set aside the sale and recover the land. In Cochran vs. Thompson, an administrator *be bonis non*, Cochran offered real property of the intestate, Smith, for sale in pursuance of an order of the Probate Court which he had obtained, and then proceeded to sell, having previously entered into a fraudulent contract with Shannon, by the terms of which Shannon was to buy in the land for cash, and reconvey two-thirds of it to Cochran, which he did. Afterwards Cochran died, and Thompson was appointed administrator *de bonis non* of Smith, and as such recovered the land of Cochran's administrators. Swink vs. Snodgrass, was an action of detinue, and the sale was held to be a pretense and a fraud, and the doctrine of the case is that if an administrator fraudulently dispose of assets to one cognizant of the fact that he is acting in violation of his trust, the sale is void, and an administrator *de bonis non* may recover them.

Upon these authorities it is apparent that collusion beween the administrator and ostensible purchaser is an es-

sential element to deprive the sale of its effect as an administration and leave the asset unadministered and subject to the power of the administrator *de bonis non*. We do not think that lot No. 7 is shown by the pleadings to have been dealt with by Sanderson simply as his individual property, and not as administrator, or fraudulently. His conveyance of it was pursuant to a probate sale, made by a former administrator, and there is not enough to show fraudulent collusion between the vendees and himself as to it. The fact that he was an administrator *de bonis non* did not preclude his consummating the sale made by his predecessor in the administration, under the legislation then in force as to such sales. Freeman's Void Judicial Sales sec. 46; Gredley vs. Phillips, 5 Kan., 349; Baker vs. Bradsby, 23 Ill., 632. The allegations of his desire to possess himself of the property, and that his deed of conveyance back to him were one transaction, are not sufficient to charge that they did not take it under the probate sale, or impute to them either complicity in or knowledge of any improper purpose on his part. This being so, we do not think it can be said that lot No. 7 has not been administered upon, in the sense that will permit the administrator *de bonis non* to recover it. Where fraud is relied upon, it should be clearly shown by the averments of the pleading. The President vs. Goff, 14 S., 6 R., 181, 184; Howard vs. P. &. A. R. R. Co., 24 Fla., 560; S. C. 5 So. Reporter 356; Wortman vs. Skinner, 12 N. J. Eq., 358; Bertine vs. Varian, 1 Edward's Chan., 343; Johnson vs. Johnson, 5 Ala., 90.

There is to lot No. 7 a fatal defect in the parties defendant to this bill. Upon the face of the bill the title to the lot was in Sanderson individually at the time of his death, and then it descended to his heirs, and they are entitled to their day in court to defend it against those seeking to set aside the conveyance by which he acquired title. Sloan vs.

Sloan, 21 Fla., 589; Whitlock vs. Willard, 18 Fla., 156; Alston vs. Rowles, 13 Fla., 110; Betton vs. Williams, 4 Fla., 11. Conveyances of the character of these are not void, but, under certain circumstances, are voidable. Price vs. Winter, 15 Fla., 109; Jennison vs. Hapgood, 7 Pick., 1. The decision in Sanchez vs. Hart, 17 Fla., 507; Wade vs. Doyle, 23 Fla., 90; Merritt vs. Daffin, 24 Fla.,    ; S. C. 4 So. Reporter, 806, do not dispense with the heirs as necessary parties in cases of the kind before us, and are not inconsistent with those relied upon and previously cited. In Sanchez vs. Hart, it is held that an administrator has the right of entry into the possession of real estate of his intestate and can maintain ejectment; that his right to recover follows his right to rents and profits, and because lands are assets in his hands with a power to collect the same, and the basis of his action is the title of his intestate. In Wade vs. Doyle, the court held that where there is an administrator on the estate of a decedent, and the estate unsettled, the heirs of the decedent cannot maintain ejectment to recover possession of his real estate, but the administrator is the proper party. He, and not the heirs, is entitled to the possession and rents and profits of the real estate until he has administered upon it. Merritt vs. Daffin decides that an administrator holding the real estate of his intestate as assets is under the law of this State the only necessary party to a suit to foreclose a mortgage made by the intestate and the heir, though not a party, is concluded by a decree of foreclosure and a sale thereon. In each of these three cases it is apparent that the land is for the purposes of the decision conceded to be assets of the intestate, and the sole question is the powers which our statutes have clothed an administrator with as to real estate considered as assets. In the case before us, the complainants are not seeking to affect real estate which is conceded to be

assets of Foreman's estate, or to reach it as assets of Sanderson's estate, but to have it declared assets or property of Foreman's estate in the hands of Sanderson's administrators. Neither the statutes nor the decisions justify us in extending the doctrine dispensing with the heirs, or extending the powers of an administrator over the title thus far ; in fact, the decisions first cited in this paragraph forbid it. In Sloan vs. Sloan, the *devisees* of Hall were subsequently and properly made parties. Even in a case of doubt, it is proper to have before the court those in whom the statute places the title. The position of the administrators with reference to complainants, and Sanderson's heirs as claimants of this lot seven, make it essential that the heirs, as well as the complainants, should be before the court to protect their respective interests.

VI. At this point it is proper to notice the averments of the bill as to the " funds in New York," which Sanderson is charged with having possessed himself of. It is said in one place that Sanderson possessed himself of them, and the amount of them is averred, upon information and belief, to have been several thousand dollars. The only other averment concerning these funds is that which charges that Sanderson's administrators have made no settlement of his administration of Foreman's estate, nor any payment or distribution, either partial or final, to those interested therein, on account thereof, but his administration is wholly unsettled.

Sanderson's administrators contend that Deans, as the successor to Sanderson in the administration, is alone entitled to recover these funds. Unless the funds continue in the same form they were in when Foreman died an administrator *de bonis non* connot recover them. Gregory vs. Harrison, *supra*, and other authorities *infra*. While it is true that the bill does not show that these funds do thus remain

in specie, it is very clear that it does not show that Sanderson has applied them, or that he misapplied them, or that they ever came to the hands of his administrators. The fact that they or Sanderson did not pay them to the complainants, or those they claim under, which the expression " payment or distribution *to those interested therein* " clearly means, does not, under the case made by the bill charge either a *devastavit* against Sanderson, or show a right of action in any distributees of Foreman, or the administrator of any distributee, for nowhere in the bill does it appear, when we consider the insufficiency of the allegations assailing the validity of the Bass claim, that the estate is solvent. Stephens vs. Frost, 2 Y. & C., 297.

In connection with these "funds in New York" or any other claim against Sanderson arising out of any personal property of the estate of Foreman which he may have misappropriated, it is proper for us to remark here that an administrator or the executor, if there be such of any distributee of Foreman inheriting from him, and who has since died, is the proper and only person to sue. The husband and children of the sisters of Foreman are improperly complainants to this bill and cannot maintain the suit as to any cause of action growing out of personalty. McHardy vs. McHardy, 7 Fla, 301, 308; Alston vs. Rowles, 13 Fla., 110; Teague vs. Corbett, *supra;* Barbour on Parties, 398, 399; Closen vs. Lawrence, 3d Ed. Chan. Reports, 48; Jenkins vs. Freyer, 4 Paige, 46.

VII. The question of multifariousness is now to beconsidered. The bill does not make a proper case for equitable relief against any of the defendants, and the orders overruling the demurrers must by set aside and all subsequent orders will necessarily fall with them, yet as it may be amended and new parties made, it is proper we should express ourselves on the subject of multifariousness.

It is true as a matter of law, that Sanderson, as administrator *de bonis non*, is not responsible for anything administered by Mrs. Foreman, and likewise Deans is not liable for whatever may have been administered by Sanderson. Deans has no right of action against Sanderson's administrators for any alleged devastavit of Sanderson; for though the statute of February 19th, 1870, (chapter 1733,) Sections 80-90, p. 98 et seq. McClellan's Digest, gives powers and rights of action not existing at the common law, to administrators *de bonis non* against executors or administrators who may have been removed by the court for cause, these provisions do not extend to the case of a delinquent deceased executor or administrator who has not been thus removed. The duty of an administrator *de bonis non* is to administer upon whatever of the estate of the intestate remains in specie and has not been administered upon by his predecessors. Gregory vs. Harrison, 4 Fla., 56; Beall, vs. New Mexico, 16 Wall., 535; American Board of Commissioners, 27 Conn., 343; 1 Williams on Executors, 604, note b; Rivers vs. Patty, 43 Miss., 338; Wankford vs. Wankford, 1 Salk., 306; Dement vs. Heth, 45 Miss., 388; Catherwood vs. Chaband, 1 Barn & Cress., 150; Carrick vs. Carrick, 8 C. E. Green, 364; Bell vs. Speight, 11 Humph., 541.

Deans is not, nor are his sureties, interested in the case presented by the bill against the administrators of Sanderson.

In view of the allegations of the bill the Elijah Bass Estate claim is the only one asserted against Foreman's estate; and if it be a fact that this claim is not a subsisting debt, there is nothing in the way of the complainants enjoying their right to whatever assets or property there may be of Foreman, the only property of which the bill gives us notice being lots Nos. 7 and 8, of block 31, in Jacksonville, and the alleged liability of Sanderson's administrators, growing out

of his administration *de bonis non.* On the other hand if this is a valid indebtedness, whatever estate there may be of Foreman is applicable to its payment before any of the complainants can receive anything as heirs or distributees. Upon the case as made by the bill considered thus far, we have before us as complainants, the heirs and distributees, an administrator *de bonis non,* and the only alleged creditor of the estate. There is no doubt but that relief to which complainants may be entitled to against Deans and the Trust Company and its commissioner could be obtained in a separate suit, and yet a suit against Sanderson's administrators without the Trust Company, as the owner of the Bass claim, as a party, or without some adjudication upon the validity of this claim, would not be effectual to settle the complainants' rights to Foreman's estate as against this claim. Again, relief in which Sanderson's administrators are concerned, is asked as to lot 8 by the prayer to set aside the conveyance of it by their intestate as administrator *de bonis non.*

As a creditor of Foreman, the Trust Company has an interest in his estate. If it be that the sale of lot 7 to pay this claim, and the purchase of the lot by the former owners of the claim, and the conveyance to them, and the subsequent re-conveyance by them to Sanderson with covenants of warranty will preclude an assertion as against such lot of the balance of the claim now held by the Trust Company, still, upon the face of the bill and the demurrer under consideration there is nothing to cut off the claim, if it is valid, from a satisfaction out of lot No. 8, and whatever may be found to be due by Sanderson's administrators. Lot No. 8 cannot be regarded in the light of this record as having been sold or offered for sale by the administratrix at the sale of October, 1856 ; and not only is this true, but the demurrer admits that the Trust Company, notwithstanding the conveyance of the lot to it by Sanderson, has surren-

dered it to Deans, as administrator, and that he was, at the filing of the bill, holding and administering upon it as assets of Foreman's estate.

The Trust Company then has an interest in the entire case made by the bill, and is a necessary party to it. Though Deans, as administrator *de bonis non*, has not any interest in the liability of Sanderson's administrators, yet we do not think that this would render a good bill multifarious as to him and his sureties.

It is not necessary to overcome the objection of multifariousness that all the parties should have an interest in all the matters contained in the suit; the objection will be defeated if it appears that each party has an interest in some matters in the suit, and they are connected with the others. Story's Eq. Pleading, 8th Edition by Redfield, Section 271 a, 279 a; Parr vs. The Attorney-General, 8 C. & F., 409, 433; Attorney-General vs. Mayor, &c., of Poole, 4 Myl. & Cr., 17; Worthy et al. vs. Johnson et al., 8 Ga. 236; Warthen vs. Brantley and Daniel, 5 Ga., 571; Wells vs. Strange, *Ibid*, 22; Campbell vs. Mackey, 1 Myl. & Cr., 603; Attorney-General vs. Cradock, 3 *Ib.*, 85; Lewis vs. Edmund, 6 Simon, 251. The inquiry is not whether each defendant is connected with every branch of the case, but whether the bill seeks relief in respect to matters separate and distinct in their natures. If the object of the suit is single, yet different persons have separate interests in distinct questions arising out of that single object, it necessarily follows that such different persons must be brought before the court in order that the suit may conclude the whole subject. Daniel's Chancery Pleading and Practice, 336; Story's Equity Pleading, Sections 534 and 539 a; Hayden vs. Thrasher, 18 Fla., 795. In Attorney-General vs. Cradock, *supra*, it is observed: The object of the rule against multifariousness is to protect a defendant from unnecessary expense; but it

would be a great perversion of that rule if it were to impose upon the plaintiffs, and all the other defendants the expense of two suits instead of one.

It seems to us after a careful consideration of the character of this case, and of the authorities upon the subject of multifariousness, that the matters sought to be presented may be more advantageously disposed of in one suit than in two. They can all be definitely settled in one suit, and it is not clear that they could be in two suits to each of which both the Trust Company, Deans, as administrator, and Sanderson's administrators, were not parties. Equity is opposed to a multiplicity of suits. Story's Equity Pleading, Section 287. The general object or purpose of this suit is the settlement of the estate of the complainants' ancestor, and it can be effected more conveniently and satisfactorily in one suit than in more.

The orders overruling the demurrers are reversed, and the case will be remanded for proceedings not inconsistent with this opinon.